UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: | ) |
| | ) |
| ROYAL DUTCH/SHELL TRANSPORT | ) |
| SECURITIES LITIGATION | )    1:06-mc-00248 (Kollar-Kotelly, J) |
| | )    D.N.J. Civ. Action No. 04-374 (JAP) |

**MOTION OF SIR PHILIP B. WATTS TO COMPEL COMPLIANCE
BY THE SECURITIES AND EXCHANGE COMMISSION
WITH RULE 45 SUBPOENA <u>DUCES</u> <u>TECUM</u>**

Pursuant to Federal Rules of Civil Procedure 37 and 45, Defendant Philip B. Watts moves this Court for entry of an order compelling the Securities and Exchange Commission ("SEC") to comply with a subpoena issued on February 8, 2006 and produce: 1) documents responsive to the subpoena's requests; 2) a privilege log; and 3) a certification that the SEC has conducted a comprehensive search for documents.

As explained more fully in the attached Memorandum of Law, the documents sought by Watts are relevant to his defense in the underlying class action, <u>In re Royal Dutch/Shell Transport Securities Litigation</u>, Case No. 04-374 (JAP), which is pending in the United States District Court for the District of New Jersey.  As also explained in the Memorandum, the SEC's objections are not supported by law.

Pursuant to Federal Rule of Civil Procedure 37(a)(2)(B) and Local Rule 7(m), Watts's counsel certifies that they have conferred in good faith with SEC counsel in an effort to resolve their disagreements regarding the subpoena without court action, but they were unable to resolve the issued raised in this motion.

Pursuant to Local Rule 7(f), Watts respectfully requests an oral hearing on this motion.

WHEREFORE, Watts respectfully requests that his Motion be granted and that the Court entered the proposed Order attached hereto.

Dated: October 5, 2006

Respectfully submitted,


_____/s/_____
Joseph I. Goldstein (D.C. Bar No. 412240)

Andrew J. Morris (D.C. Bar No. 411865)
Adriaen M. Morse Jr. (D.C. Bar No.483347)
Aimée D. Latimer (D.C. Bar No. 476693)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, DC 20006-1101
Telephone: 202-263-3000
Facsimile: 202-263-3300

*Counsel for Sir Philip B. Watts*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | |
| ROYAL DUTCH/SHELL TRANSPORT | ) | |
| SECURITIES LITIGATION | ) | 1:06-mc-00248 (Kollar-Kotelly, J) |
| | ) | D.N.J. Civ. Action No. 04-374 (JAP) |
| | ) | |

**MEMORANDUM OF LAW OF SIR PHILIP B. WATTS
IN SUPPORT OF HIS MOTION TO COMPEL
COMPLIANCE BY THE SECURITIES AND EXCHANGE COMMISSION
WITH RULE 45 SUBPOENA DUCES TECUM**

Joseph I. Goldstein (D.C. Bar No. 412240)
Andrew J. Morris (D.C. Bar No. 411865)
Adriaen M. Morse Jr. (D.C. Bar No.483347)
Aimée D. Latimer (D.C. Bar No. 476693)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, DC 20006-1101

*Counsel for Sir Philip B. Watts*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 3

I.     THE UNDERLYING SECURITIES CLASS ACTION LITIGATION
       SPECIFICALLY RELIES ON SEC STAFF INFORMAL GUIDANCE ......................... 3

II.    THE SUBPOENA <u>DUCES</u> <u>TECUM</u> ................................................................... 6

ARGUMENT ....................................................................................................................... 10

I.     THE LAW REQUIRES THAT THE SEC MAKE SPECIFIC SHOWINGS TO
       SUPPORT ITS OBJECTIONS ......................................................................................... 11

       A.     Burdensomeness: The SEC Must State Facts Showing That Its Burden
              Outweighs Watts' Need for the Documents ......................................................... 11

       B.     Deliberative-Process Privilege: The SEC Must State Facts Satisfying The
              Requirements For This "Narrow" Privilege ........................................................ 12

              1.     The SEC must show that the information is deliberative,
                     predecisional, and has not had an "operative effect." ............................. 12

              2.     Because this is a qualified privilege, the SEC must show that its
                     need for secrecy outweighs Watts' need for the information. ................. 15

II.    THE SEC HAS NOT MADE, AND CANNOT MAKE, THE REQUIRED
       SHOWING WITH RESPECT TO ANY OF THE DOCUMENTS AT ISSUE ............. 16

       A.     Internal Documents Relating To Rule 4-10 And The Staff Outline
              (Requests 1 through 4) ....................................................................................... 16

              1.     The burdensomeness objection is unsupported and unsupportable. ........ 16

              2.     The deliberative-process privilege assertion is unsupported and
                     unsupportable, and in any event the privilege would be overridden. ...... 17

       B.     Documents Reflecting SEC Communications With Third Parties
              (Requests 5 through 8) ....................................................................................... 19

              1.     The burdensomeness objection is unsupported and unsupportable. ........ 19

              2.     The deliberative-process privilege does not apply to
                     communications with third parties. ........................................................ 20

       C.     The SEC Should Be Required To Provide A Certification And A Privilege
              Log ..................................................................................................................... 20

              1.     The SEC's assurances that it produced all responsive letters and e-
                     mails repeatedly have been in error. ..................................................... 20

              2.     The SEC should certify that it has conducted an appropriate search
                     for responsive documents, and should produce a privilege log. ............. 21

CONCLUSION.................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases:**

Athridge v. Aetna Cas. & Surety Co., 184 F.R.D. 181 (D.D.C. 1998)........................................19

Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854 (D.C. Cir. 1980) .................12, 13, 18

Commerce & Indus. Ins. Co. v. Grinnell Corp., Civ. Action No. 97-0775 c/w 97-0803,
     2001 U.S. Dist. LEXIS 1441 (E.D. La. Feb. 2, 2001) ........................................................21

Eugene Burger Mgmt. Corp. v. HUD, 192 F.R.D. 1 (D.D.C. 1999) ..............................................14

First Eastern Corp. v. Mainwaring, 21 F.3d 465 (D.C. Cir. 1994) ................................................15

Flanagan v. Wyndham Int'l Inc., 231 F.R.D. 98 (D.D.C. 2005) ........................................... passim

In re Subpoena Duces Tecum Served Upon Office of Comptroller of Currency, 151
     F.R.D. 1 (D.D.C. 1992)................................................................................................18, 19

Jordan v. Dep't of Justice, 591 F.2d 753 (D.C. Cir. 1978) .....................................................15, 18

Judicial Watch, Inc. v. U.S. Postal Serv., 297 F. Supp. 2d 252 (D.D.C. 2004)............................12

NLRB v. Sears, Roebuck & Co., 421 U.S. 132 (1975) .................................................13, 14, 18, 20

Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395 (D.C. Cir. 1984)...........11, 12, 15, 17

Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168 (1975) ........13, 15, 17, 18, 20

Tax Analysts v. IRS, 117 F.3d 607 (D.C. Cir. 1997)............................................................. passim

United States v. Fesman, 781 F. Supp. 511 (S.D. Ohio 1991) .....................................................21

United States v. Motorola, Inc., No. Civ. A. 94-2331TFH/JMF, 1999 WL 552558,
     (D.D.C. May 27, 1999) ......................................................................................................13

Wolfe v. Dep't of Health and Human Servs., 839 F.2d 768 (D.C. Cir. 1988) ..............................12

**Statutes:**

17 C.F.R. § 202.1(d) ......................................................................................................................4

17 C.F.R. § 210.4-10......................................................................................................................4

17 C.F.R. § 210.4-10(a)(2)..............................................................................................................4

Fed. R. Civ. P. 45(d)(2).......................................................................................................11, 13, 22

Fed. R. Civ. P. 30(b)(6).............................................................................................................1, 6

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

**Miscellaneous:**

Current Issues and Rulemaking Projects (Nov. 14, 2000)...............................................................3

Division of Corporation Finance: Current Accounting and Disclosure Issues
(June 30, 2000)................................................................................................................3

Division of Corporation Finance: Frequently Requested Accounting and Financial
Reporting Interpretations and Guidance (Mar. 31, 2001).....................................................3

Defendant Philip B. Watts submits this memorandum in support of his motion to compel the U.S. Securities and Exchange Commission ("SEC") to comply with a subpoena <u>duces</u> <u>tecum</u> served in connection with an action pending in the United States District Court for the District of New Jersey.  Ex. 1.[1]  Already pending before this Court is Watts' motion, filed May 26, 2006, to compel the SEC to comply with a subpoena <u>ad</u> <u>testificandum</u> for a Rule 30(b)(6) deposition of the SEC.

## INTRODUCTION

In response to the subpoena <u>duces</u> <u>tecum</u>, the SEC has taken a conspicuously casual approach to its obligations.  The agency asserts boilerplate objections of undue burden and deliberative-process privilege, but does not bother to articulate a legal or factual basis for those objections.  The governing law does not permit the SEC to brush subpoenas aside so easily.  Watts, therefore, asks the Court to order the SEC to produce two groups of documents, to provide a privilege log, and to give a sworn certification that it has conducted an appropriate search for responsive documents.

This memorandum explains why the burdensomeness and privilege objections are unfounded.  For each of the two groups of documents at issue, this memorandum first explains that the SEC's burdensomeness objection fails at the threshold.  The SEC simply has failed, as required, to provide facts to support its objection.  Nothing in the record indicates that producing the documents requested would be burdensome.  Indeed, the information to date is precisely to the contrary.  When the SEC did produce a portion of the documents requested, after initially objecting that the production would be extremely burdensome, that production amounted to a total of about three boxes.  This hardly suggests that this case involves a large document production.

---

[1]    All citations to exhibits ("Ex.") refer to the declaration of Andrew J. Morris, attached hereto.

For the same two groups of documents, this memorandum next explains that the SEC's broad assertion of the deliberative-process privilege fails because the requested documents are not "pre-decisional." Again, the SEC has not even attempted to create the factual record required to support the privilege. Nor could the SEC do so. The documents at issue are far from preliminary; they involve the actual application of a SEC formal rule and an informal SEC policy to various registrants.

Third and finally, this memorandum explains that, to the extent the SEC has agreed to produce documents, its production is demonstrably deficient. For example, some of the documents produced specifically refer to other documents that should be in the SEC's files, but that the agency did not produce. As a result, Watts also requests an order requiring that the SEC certify it has conducted an appropriate search.

The SEC's casual approach to its document discovery obligations is especially inappropriate in light of the SEC's own emphasis on proper document retention and careful compliance with subpoenas, and its own enforcement actions against registrants who do not comply appropriately with the agency's subpoenas. See, e.g., Ex. 2 (obtaining substantial penalty and other sanctions for conduct including failure to conduct including failure to conduct prompt and diligent searches in response to SEC document requests and subpoenas); Ex. 3 (imposing substantial penalty and other sanctions for failure to retain emails and promptly produce them in response to requests from SEC Staff).

Watts' subpoena does not reflect an attempt to use a federal agency as a discovery resource in a garden-variety civil dispute. This is a highly unusual case in which a class-action complaint – seeking billions of dollars in damages – explicitly bases charges of financial reporting fraud on requirements contained only in informal guidance given by the SEC

employees in the Division of Corporation Finance ("SEC Staff"). This is, therefore, the rare case in which the informal Staff guidance lies at the center of the issues. The plaintiff in this proceeding, Sir Philip B. Watts, is a defendant in that class-action litigation. Watts also was the subject of a formal and lengthy investigation by the Financial Services Authority ("FSA"), which is the United Kingdom's equivalent to the SEC. That agency concluded that Watts did not engage in fraud and discontinued its proceeding. Watts also was the subject of a separate SEC formal investigation. Like the FSA, the SEC dropped this investigation without charging Watts. Now, the governing law requires the SEC to provide the limited discovery that is critical to Watts' defense in the class-action litigation.

## FACTUAL BACKGROUND

### I.    THE UNDERLYING SECURITIES CLASS ACTION LITIGATION SPECIFICALLY RELIES ON SEC STAFF INFORMAL GUIDANCE

The underlying litigation bears an unusual connection with the work of the SEC Staff. It arises directly from actions taken by the SEC Staff – not the Commission itself – to alter the reporting regime that applies to oil and gas companies. The litigation is a securities fraud class action brought against Royal Dutch/Shell Transport & Trading, now known as Royal Dutch Shell plc ("Shell"), and other defendants, including Watts. Watts is the former Chairman of Shell's Committee of Managing Directors.

The heart of the case is plaintiffs' allegation that Shell fraudulently overstated the volume of its "proved" oil and natural gas reserves by booking reserves that did not comply with SEC regulations or SEC Staff informal guidance as stated in several iterations of an interpretive document, collectively known as the Staff Outline.[2] See Ex. 7 at ¶¶ 6-9.

---

[2]    The "Staff Outline" refers to the following documents posted on the SEC website, www.sec.gov: (1) Division of Corporation Finance: Current Accounting and Disclosure Issues (June 30, 2000); (2) Current Issues and Rulemaking Projects (Nov. 14, 2000); and (3) Division of Corporation Finance: Frequently Requested

Financial accounting for oil and gas reserves is governed by SEC Rule 4-10. 17 C.F.R. § 210.4-10. Under this rule, a company can book "proved reserves" if "geological and engineering data demonstrate with <u>reasonable certainty</u>" that the reserves are "recoverable in future years from known reservoirs under existing economic and operating conditions." 17 C.F.R. § 210.4-10(a)(2) (emphasis added). Rule 4-10 does not define "reasonable certainty."

The SEC published Rule 4-10 in 1978. Although the years since then have seen a transformation in the technology for identifying oil and gas reserves, the SEC has never amended the rule. In 2000 and 2001, the SEC Staff addressed Rule 4-10 in the Staff Outline. Although the Staff Outline purported to do no more than provide "guidance" in the application of Rule 4-10's definition of proved reserves, <u>see</u> Ex. 7 at ¶ 133, in fact the Staff Outline supplemented and substantially altered Rule 4-10. It added specific requirements that companies must meet to achieve "reasonable certainty." It introduced technical terms and concrete tests not found in Rule 4-10. In short, the Staff Outline significantly reduced the scope of oil and gas reserves that companies could book as "proved." <u>See</u> <u>id.</u> at ¶ 132. The Complaint quotes these Staff Outline provisions as the basis for certain SEC reserves reporting requirements. <u>See</u> <u>id.</u>

The SEC conceded that the Staff Outline is not enforceable law, but the SEC Staff treated it as exactly that. The Staff consistently demanded that companies comply with its restrictive provisions.[3] The SEC Staff gave speeches at industry conferences in which it insisted on compliance with the Staff Outline. <u>See</u>, <u>e.g.</u>, Ex. 11 at SEC 00612. The Staff publicly warned companies that they must comply with the Staff Outline. <u>See</u> Ex. 12. The SEC Staff also issued comment letters ordering oil and gas companies to change their reserves reporting to comply

---

<u>Accounting and Financial Reporting Interpretations and Guidance</u> (Mar. 31, 2001), and any subsequent amendments or versions of these documents. <u>See</u> Exs. 4-6.

[3]      <u>See</u> Ex. 8; 17 C.F.R. § 202.1(d) (staff statements "do not constitute an official expression of the [SEC's] views").

with the Staff Outline.  See, e.g., Ex. 9 at SEC 00558, 00563-65; Ex. 13 at SEC 000472-73; Ex.

10 at 00577-81.  For example, the SEC Staff demanded that BP America, Inc. show that it had

complied with specific reporting requirements found in the Staff Outline but not in Rule 4-10.[4]

The Staff Outline was a major factor in Shell's decision to change its method of

accounting for its reserves.  In an effort by Shell reserves reporting personnel to comply with the

Staff Outline, Shell enacted new, restrictive internal guidelines.  See Ex. 7 at ¶ 128; Ex. 14 at 6-

7.  Ultimately, these guidelines led Shell to write down reserves, most of which it had booked

before the Staff Outline was published.  Ex. 7 at ¶¶ 130, 171; Ex. 14 at 9.

Several months later, the SEC issued a Cease and Desist Order against Shell relating to

the write-down.  That Order expressly relied on the Staff Outline – not only Rule 4-10 – as the

basis for a charge that Shell had overstated its proved reserves.  In turn, the Complaint in this

case repeatedly cites to the allegations in the Cease and Desist Order as evidence that Shell failed

to comply with Rule 4-10.  See, e.g., Ex. 7 at ¶¶ 273, 306-9, 497-99.

The Complaint also relies directly on the Staff Outline.  See, e.g., id. at ¶¶ 132-36.  In

fact, evidencing the Staff Outline's effect upon the oil and gas industry, the Complaint

mischaracterizes it as an official SEC document.  See id. at ¶ 133 (explaining that the "SEC

issued guidelines [the Staff Outline] requiring companies to have investment commitments and

other supporting evidence . . . ").

It is, therefore, important to Watts' defense to develop information about how the Staff

Outline changed the requirements governing the reporting of oil and gas reserves.  Evidence that

---

[4]       In one letter, from December 2003, the Staff demanded that BP America, Inc. "[a]ffirm to us that you have
gas sales contracts for those operating areas (e.g., Rest of World) that are without robust gas markets."  Ex. 9 at SEC
00563 (emphasis added).  In February 2004, the SEC Staff castigated BP for booking "Australian proved gas
reserves beyond the life of the sales contracts . . . .  Be advised that we require compelling evidence of established,
robust gas market capacity for such volumes."  Ex. 10 at SEC 00579 (emphasis added).  The requirement for an
actual sales contract before booking gas reserves is not found in Rule 4-10 but was in the Staff Outline.

the Staff Outline changed those requirements supports Watts' position that Shell reported its reserves appropriately under the pre-Staff Outline reporting regime and, therefore, supports his position that there was no fraud.

The SEC's comment letters are relevant for an additional reason. Some of the comment letters assented to the booking by other oil and gas companies of the same reserves for which Watts and Shell are charged with fraud. These reserves lie in fields that these companies share with Shell, and in which each company holds an undifferentiated right to a percentage of the field's oil or natural gas.

For example, ExxonMobil Corporation, Total S.A., and Shell share rights to the Kashagan oil field, located in Kazakhstan. The SEC Staff issued comment letters to ExxonMobil and Total, in which the Staff criticized both companies for booking proved reserves from that field. However, in both comment letters the SEC Staff stated that, in light of subsequent developments, "we will not object to your inclusion of these volumes as proved reserves in your 2003 Form 10-K." See Exs. 15, 16.

By contrast, because Shell booked its share of reserves from Kashagan - the same field booked under the same circumstances – the SEC charged Shell with fraud. See Ex. 14 at 14. This unequal treatment highlights – in dramatic fashion – Watts' compelling need for discovery on this topic.

## II.    THE SUBPOENA <u>DUCES</u> <u>TECUM</u>

On February 8, 2006, Watts served the SEC with the subpoena <u>duces</u> <u>tecum</u> now at issue. (Watts also served the SEC with a Rule 30(b)(6) subpoena <u>ad</u> <u>testificandum</u>, which is the subject of the motion to compel that Watts filed several months ago on May 26, 2006.) The subpoena <u>duces</u> <u>tecum</u> lists eight requests, which can be grouped into two categories. (The subpoena also contains a catch-all Request 9, which Watts need not pursue here.) The requests seek documents

addressing the meaning and application of two terms: "proved oil and gas reserves," and
"reasonable certainty," as used in the following two contexts:

1.    Internal SEC documents addressing Rule 4-10, Ex. 1 at 4-5 (Subpoena
      Requests 1 and 2), or the Staff Outline, id. at 6-7 (Subpoena Requests 3
      and 4).

2.    Communications between the SEC and third parties, including oil and gas
      companies, auditors, analysts and engineers, id. at 7-8 (Requests 5, 6, 7
      and 8).

Because the issue in the underlying litigation is whether the Staff Outline changed the
requirements imposed by Rule 4-10, which the SEC promulgated in 1978, the subpoena covers
the years since that date. Although this may initially look like a large number of years, in
practice the years before 1999 should add little to the SEC's burden. Watts' understanding is
that significant documents might exist for the four years from 1978 to about 1981 – the years
when the rule was adopted and implemented – but that there should be few or no documents
from the years 1981 through about 2000. The SEC has not indicated otherwise. (Watts stands
ready to revise his request in a reasonable manner to the extent that a search indicates that any
request would be unduly burdensome.)

In response to the subpoena, the SEC initially refused to produce any documents. It
asserted a barrage of blanket objections, including overbreadth, burdensomeness, and "several
privileges, specifically the law enforcement, deliberative process, and/or attorney client
privileges, as well as the attorney work product doctrine." See Ex. 17. The SEC did not bother
to justify any of these assertions or to connect them with any particular document requests.

Counsel for Watts then engaged in several rounds of correspondence with the SEC's
Office of the General Counsel. The two sides did not make progress on the SEC's blanket
objections to the first group of requests. As to the request for SEC communications with third
parties (other than Shell), however, in an effort at compromise Watts offered to tentatively

narrow the scope to 25 third parties and the last ten years.  <u>See</u>, <u>e.g.</u>, Ex. 18.  Moreover, Watts understands that the communications at issue already are organized in files according to the third party.  <u>See</u> Exs. 19 at 1, 20 at 3.  After much back-and-forth, the SEC did produce certain correspondence with third parties.  <u>See</u> Ex. 21.  These documents constituted about 5,000 to 6,000 pages, or about a total of three boxes.  With respect to Request 6, which relates only to communications with Shell and its external auditors, the SEC responded that it would produce responsive documents if Watts covered the costs of searching for and retrieving the documents from the agency's remote storage location.  <u>See</u> Ex. 8.  Watts recently responded that it was willing to accept the SEC's offer provided that the parties reach a written agreement outlining the scope and logistics of the search and production.  <u>See</u> Ex. 22.

Unfortunately, the SEC's productions remains deficient.  First, the SEC produced no documents at all in response to the requests for documents relating to the first group of requests: SEC documents relating to Rule 4-10 and the Staff Outline.  The only documents it produced were in the second group: correspondence with third parties, including Shell.  (We address the deficiencies in this production in part II.B.1. below.)  However, the SEC initially unilaterally narrowed the scope of Requests 5, 7 and 8 to produce only "written" communications stored on the agency's electronic system, and narrowed the time scope of Request 6 to a ten-year period. <u>See</u> Ex. 23.

Second, even that production is incomplete, despite the SEC's indication on two occasions that all responsive documents had been produced.  <u>See</u> Exs. 21, 24.  (We address this deficiency in part II.B.2. below.)  For example, the SEC produced relevant comment letters it had sent to registrants, but failed to produce any of the letters that registrants sent in response. After Watts pointed out this omission, <u>see</u> Ex. 20, the SEC produced some of those responses.

See Ex. 25.  Even then, the SEC redacted portions of these letters – asserting that these communications with third parties are privileged.  See id.  Following a review of the SEC's production, it was clear that the SEC still had not produced numerous responsive communications, particularly emails with various oil and gas industry representatives.  Watts identified specific communications that the SEC had not produced but were identified in cross-references in documents that had been produced.  See Exs. 26, 27. When Watts twice brought these latest deficiencies to the SEC's attention, the SEC produced one additional document and issued a blanket assertion that the agency searched for the documents, but could not locate them. See Ex. 24. [5]

Another problem was the SEC's representation that it maintains no records of its oral communications with registrants about SEC reporting requirements.  See Ex. 8 at 2.  Watts has repeatedly sought information from the agency about the SEC's procedures for tracking communications with registrants, auditors, advisors, consultants and other third parties during telephone calls and meetings.  See Exs. 27, 29, 30.  The SEC has not provided this information.

After Watts challenged the SEC's representation that it possessed no records of oral communications, the SEC did turn up limited telephone notes of conversations with oil and gas companies, including Shell. Yet the SEC then contended that all of these notes – constituting conversations with third parties – are privileged.

Finally, the fact that the relevant documents for the years 1997 to 2006 – most likely the years with the most responsive documents – amounted to only about three boxes of documents,

---

[5]     The SEC did produce one document that had not been produced previously, but had been referenced in a document that was produced, as follows:  The SEC had agreed to produce correspondence with the Society of Petroleum Engineers.  See Ex. 26. The SEC, however, did not produce any such correspondence.  But  a letter that the SEC did produce references a letter between the agency and the Society of Petroleum Engineers.  Watts brought this to the SEC's attention with a request that the agency produce the communication and confirm that it searched for communications between the agency and the two organizations.  See id.  The SEC produced the communication at issue, but offered no assurances or confirmations that no other similar communications with either organization exist.  See Ex. 28.

demonstrates the reasonableness of Watts' initial request for documents dating back to 1978. Because extending the search back would not be unduly burdensome (and although Watts agreed to tentatively limit the production to the last ten years), Watts is entitled to documents extending back to 1978.

**ARGUMENT**

The SEC asserts two primary objections: undue burden and the deliberative-process privilege.[6] Part I below summarizes the law governing those objections, explaining what the SEC would have to show to sustain them. Part II applies that law to the two groups of documents at issue: the requests for internal SEC documents (part II.A.) and the requests relating to SEC communications with third parties (part II.B.).

The law governing the SEC's discovery obligations should be read against the background of the SEC's own demands for strict compliance with its subpoenas and document requests. The SEC has been aggressive about compelling compliance from registrants, and seeking monetary sanctions against those who fail to comply or otherwise obstruct or frustrate the agency's efforts to collect documents. See, e.g., Exs. 2, 3. Here, Watts is seeking only what the SEC insists it receive in response to its own subpoenas and requests for documents: a thorough search and a comprehensive production of responsive documents.

---

[6]    In a footnote to its letter dated April 27 2006, the SEC further stated summarily that the subpoena sought information "protected by the attorney-client and law enforcement privileges and by the work product doctrine to the extent it involves communications between the staff and the Commission and to the extent it relates to ongoing SEC investigations." Ex. 31. The subpoena does not seek documents relating to any ongoing SEC investigation. Watts explained this to the SEC. See Ex. 19 at 1-2.

I.    **THE LAW REQUIRES THAT THE SEC MAKE SPECIFIC SHOWINGS TO SUPPORT ITS OBJECTIONS.**

A.    **Burdensomeness: The SEC Must State Facts Showing That Its Burden Outweighs Watts' Need for the Documents**

To prevail on its burdensomeness objection, the SEC must show that the burden of producing the documents sought by Watts outweighs Watts' "need for, and the relevance of, the information being sought." Flanagan v. Wyndham Int'l Inc., 231 F.R.D. 98, 102-103 (D.D.C. 2005) (citing cases). It must establish that the request is "unreasonable or oppressive in the context of all the circumstances of the case." Id. at 102 (internal quotation marks and alternations omitted). As the D.C. Circuit stated in another case involving a federal agency, "[t]his is a heavy burden." Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 403 (D.C. Cir. 1984) (holding that the State Department had not met this burden). This showing is especially difficult in "a discovery dispute for an action pending in a different district," because in such a case the court "should err on the side of permissive discovery." Flanagan, 231 F.R.D. at 103.

To discharge this burden, the SEC cannot rely on mere boilerplate. Rather, it "must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one." Id. at 102 (internal quotation marks omitted). Rule 45 itself codifies this requirement, requiring that objections "shall be supported by a description of the nature of the documents . . . sufficient to enable the demanding party to contest the claim." Fed. R. Civ. P. 45(d)(2).

**B.      Deliberative-Process Privilege: The SEC Must State Facts Satisfying The Requirements For This "Narrow" Privilege**

**1.      The SEC must show that the information is deliberative, predecisional, and has not had an "operative effect."**

The party asserting the deliberative-process privilege bears the burden to establish that the privilege applies.  See Tax Analysts v. IRS, 117 F.3d 607, 616 (D.C. Cir. 1997).  Proper assertion of the deliberative-process privilege requires compliance with "clearly defined procedures."  Northrop Corp., 751 F.2d at 404.  It "requires a formal claim of privilege by the head of the department with control over the information."  Id. at 405 n.11.  "That formal claim must include a description of the documents involved, a statement by the department head that she has reviewed the documents involved, and an assessment of the consequences of disclosure of the information."  Id.

Through this procedure, the government must establish two things: that the requested information is "predecisional," meaning that it was "generated before the adoption of an agency policy," and that it is "deliberative," meaning that it "'reflect[s] the give-and-take of the consultative process.'"  Tax Analysts, 117 F.3d at 616 (emphasis in original) (quoting Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)).  To make these showings, the government must "pinpoint an agency decision or policy to which the document contributed."  Judicial Watch, Inc. v. U.S. Postal Serv., 297 F. Supp. 2d 252, 259 (D.D.C. 2004) (internal quotation marks omitted).

The deliberative-process privilege must be "construed as narrowly as consistent with efficient Government operation."  Wolfe v. Dep't of Health and Human Servs., 839 F.2d 768, 773-774 (D.C. Cir. 1988) (internal quotation marks omitted); accord Coastal States, 617 F.2d at 868.  Its purpose is "to protect against premature disclosure of proposed policies before they have been finally formulated or adopted," id. at 866, in order to protect "frank discussion" and

-12-

encourage "candor." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975) (internal quotation marks omitted). The rationale is that, at the predecisional stage, an agency has a recognized interest in secrecy while, at the same time, the public's interest in obtaining information is reduced. The "public is only marginally concerned with reasons supporting a policy which an agency has rejected, or . . . adopted on a different ground," Id. at 152, or with "recommendations which do not ripen into agency decisions." Id. at 153 n.18. Thus the "focus" of the privilege is "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." Id. at 150 (internal quotation marks omitted).

Once a decision is made, however, the agency's need for secrecy comes to an end. It is replaced by an "increased public interest in knowing the basis for agency policy already adopted." Id. at 152. According to the U.S. Supreme Court, "the public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted." Id. (emphasis added). This is because "[t]hese reasons, if expressed within the agency, constitute the 'working law' of the agency." Id. at 152-53 (emphasis added). The deliberative-process privilege simply "cannot be used to shield the reasoning behind a final governmental decision." United States v. Motorola, Inc., No. Civ. A. 94-2331TFH/JMF, 1999 WL 552558, at *2 (D.D.C. May 27, 1999).

For these reasons, the test for whether information is "predecisional" or "post-decisional" centers on whether any act or statement had a "real operative effect" inside or outside the agency. Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 186-187 (1975); see also Coastal States, 617 F.2d at 867. This test is a practical one. See Tax Analysts, 117 F.3d at 617 n.8; see also Coastal States, 617 F.2d at 860 n.8. In particular, it does not require the

formality of a "final agency action" under the Administrative Procedure Act. This Circuit has emphasized the "strong theme" that "an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege" based on the fact that "it is not designated as 'formal,' 'binding,' or 'final.'" Id. at 867, quoted in Tax Analysts, 117 F.3d at 617. Even the SEC agrees on that point. See Ex. 31 at 3.

Accordingly, any command from a superior to a subordinate, or any statement that is relied upon by others in an agency, is post-decisional and, therefore, lies outside the privilege. See  Coastal States, 617 F.2d at 867. Information is not protected if it "is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public," id. at 866, or if "it memorializes or evidences the policy the agency ultimately adopts on an issue or because the agency used the document in its dealings with the public." Eugene Burger Mgmt. Corp. v. HUD, 192 F.R.D. 1, 5 (D.D.C. 1999).

Several examples illustrate the point.  In Sears, the Supreme Court held that recommendations made by NLRB attorneys about whether to file a complaint were not privileged because they were included in "Advice and Appeals Memoranda" that reflected final – though internal – decisions by an NLRB Committee. Sears, 421 U.S. at 158. In Coastal States, the D.C. Circuit held that "explanations of agency regulations" distributed to Energy Department auditors were post-decisional. The explanations were "intended to have effect upon actions of others in the agency" and were "routinely used by agency staff as guidance . . . and were retained and referred to as precedent." 617 F.2d at 867, 869. In Tax Analysts, the D.C. Circuit held that IRS memoranda interpreting the tax laws were post-decisional. Although these memoranda were "not formally binding," they were "statements of an agency's legal position" that were "relied

upon by field personnel."  117 F.3d at 617.  Because their issuance "may [have] precede[d] the

field office's decision in a particular taxpayer's case," they were predecisional in relation to

those later decisions.  Id.  But the memoranda themselves were post-decisional and, therefore,

discoverable because they constituted decisions in relation to the agency's legal position, and

they did "not precede the decision regarding [that] legal position."  Id.  Similarly, in Jordan v.

Dep't of Justice, the Court held that internal guidelines distributed by the U.S. Attorney were

post-decisional.  591 F.2d 753, 774 (D.C. Cir. 1978).  Though not "absolutely binding," the

materials "create[d] definite standards for Assistant U.S. Attorneys to follow."  Id.  Because

those guidelines "express[ed] the settled and established policy of the U.S. Attorney's Office,"

they "represent[ed] the promulgation and implementation of policies that ha[d] already been

adopted."  Id.

## 2.    Because this is a qualified privilege, the SEC must show that its need for secrecy outweighs Watts' need for the information.

The deliberative-process privilege is a qualified privilege, so that its force is only

"relative to the [requesting party's] need demonstrated for the information."  Northrop Corp.,

751 F.2d at 404.  Relevant factors include the relevance of the information; the seriousness of the

litigation and the issues involved; the availability of other evidence; the government's role in the

litigation; and the extent to which disclosure would hinder internal agency discussions regarding

contemplated policies and decisions.  See First Eastern Corp. v. Mainwaring, 21 F.3d 465, 468

n.5 (D.C. Cir. 1994).  Accordingly, even if this Court concluded that the deliberative-process

privilege applied to some of the documents at issue, the SEC still would have to show that its

need for secrecy outweighs Watts' need for the information.  (And as we explain below, the SEC

has made no showing at all, much less one that could outweigh Watts' need.)

## II.    THE SEC HAS NOT MADE, AND CANNOT MAKE, THE REQUIRED SHOWING WITH RESPECT TO ANY OF THE DOCUMENTS AT ISSUE.

### A.    Internal Documents Relating To Rule 4-10 And The Staff Outline (Requests 1 through 4)

Requests 1 and 2 seek documents addressing the meaning and application of "reasonable certainty" and "proved oil and gas reserves" as used in Rule 4-10.   Watts seeks these documents to the extent that they post-date the rule.   Requests 3 and 4 seek documents concerning the meaning and application of "proved reserves" as used in the Staff Outline.   See Ex. 1 at 6-7. (Again, Watts seeks documents relating to Rule 4-10 only to the extent the documents post-date the rule's effective date.)   The SEC objects to all of these requests, in their entirety, on the grounds of undue burden and the deliberative-process privilege.

### 1.    The burdensomeness objection is unsupported and unsupportable.

The burdensomeness objection fails the threshold requirement that the SEC provide a "specific demonstration of [supporting] facts."   Flanagan, 231 F.R.D. at 102 (internal quotation marks omitted).   The only justification the SEC has provided for this objection is that Watts' requests "would require review of thousands of files just for us to quantify what would constitute the universe of responsive documents."   Ex. 17.   That vague statement says literally nothing in the nature of "a specific demonstration of facts."   Rather, it is exactly the "conclusory or speculative statements" that, this Court has held, are insufficient.   Flanagan, 231 F.R.D. at 102 (internal quotation marks omitted).   The statement does not provide the information needed to evaluate the objection, or for this Court to make a ruling.

It is, moreover, very doubtful that the SEC could make the required showing if it tried. There is no reason to believe that these other requests would not involve production of a size equivalent to the three boxes of documents the SEC has produced already in response to the request for communications with third parties.   Finally, as Watts has indicated, if the SEC did

-16-

come forward with a "specific showing" that this production would be unduly burdensome, Watts would be willing to modify the request as appropriate.  See Northrop Corp., 751 F.2d at 404 (noting the willingness of the party issuing the subpoena to modify its scope upon receipt of information indicating the appropriateness of such modification).

> **2.    The deliberative-process privilege assertion is unsupported and unsupportable, and in any event the privilege would be overridden.**

With respect to this group of document requests, the SEC's deliberative-process objection is equally unfounded.  To begin with, the agency has not provided the required "description of the documents involved, a statement by the department head that she has reviewed the documents involved, and an assessment of the consequences of disclosure of the information."  Id. at 405 n.11.  This should end the matter.  As the D.C. Circuit explained, by definition an agency that has not retrieved the relevant documents cannot have discharged its burden to justify its privilege assertion, because "documents which have not yet been retrieved have not yet been examined or considered by the head of the department."  Id. at 404 (rejecting the assertion of the deliberative-process privilege by the State Department).

Although the SEC has not explained the basis of its assertion of this privilege with respect to the subpoena duces tecum, the SEC apparently contends that the privilege protects all staff deliberations as long as they "have not been made public."  Ex. 17 (addressing subpoena ad testificandum); Ex. 31 at 3 (same).  This contention fails because the SEC has not bothered to connect it to any documents, and in any event it is contrary to the law.  The test is not whether documents have been made public, but whether they are "deliberative" and "predecisional," Tax Analysts, 117 F.3d at 616, and whether they have had "real operative effect."  See Renegotiation Bd., 421 U.S. at 186-87; Coastal States, 617 F.2d at 867.

-17-

The Staff Outline indisputably has had an "operative effect." The SEC has enforced it across the oil and gas industry, as demonstrated by the SEC Staff's speeches and its correspondence with registrants. The effect of the Staff Outline also has been sorely felt, of course, by Watts in the underlying class action litigation. Therefore, documents that explain or apply the Staff Outline are post-decisional and not protected by the privilege. See, e.g., Sears, 421 U.S. at 161 (the privilege does not protect documents written to explain or support an established policy); Renegotiation Bd., 421 U.S. at 184 ("postdecisional memoranda setting forth the reasons for an agency decision already made . . . are not" protected by the privilege). Permitting the SEC to shield these documents would permit exactly the kind of "secret law" that is forbidden. See Coastal States, 617 F.2d at 867.

On parallel facts, the D.C. Circuit has consistently permitted discovery of agency staff interpretations and guidelines, and information explaining those interpretations and guidelines. The court ordered production of the IRS field service advice memoranda in Tax Analysts, 117 F.3d at 620, the Energy Department guidance to its auditors in Coastal States, 617 F.2d at 870, and the materials for the guidance of line prosecutors in Jordan, 591 F.2d at 772.

All of this shows that the privilege does not apply to the documents at issue here. Even if the privilege did apply, however, it would yield to Watts' need for the documents. See In re Subpoena Duces Tecum Served Upon Office of Comptroller of Currency, 151 F.R.D. 1, 2 (D.D.C. 1992) (explaining the qualified nature of this privilege). First, the information is highly relevant. See id. The SEC's interpretation of Rule 4-10 and the Staff Outline, and its communications with third parties regarding these interpretations, are at the heart of the allegations in the underlying class action litigation. See, e.g., Ex. 7 at ¶¶ 126, 128, 129, 130, 136, 138, 148, 149, 179, 180, 193, 194, 195, 207, 212, 215-25, 227, 229, 232, 271, 272, 273,

277, 278, 291, 292.  Second, the seriousness of the litigation (see In re Subpoena Duces Tecum, 151 F.R.D. at 2) is beyond dispute, because the claims against Watts amount to billions of dollars.  Third, this information is not available from any other source.  See id.  Fourth, although the government is not a party to the underlying litigation, the SEC Staff's decision to issue and apply the Staff Outline (and to do so without providing the information ordinarily provided through the notice-and-comment process) made this information critical to Watts' defense.  See id.

Finally – and critically – the SEC has not articulated any concrete interest in secrecy.  See id.  The SEC's own conduct in this matter confirms that the SEC has no such interest.  The SEC Staff's discussion of the Staff Outline in speeches and in correspondence directly contradicts the SEC's current assertion that disclosing this same information in this litigation would harm the SEC's interest in secrecy.

> **B.    Documents Reflecting SEC Communications With Third Parties (Requests 5 through 8)**

> **1.    The burdensomeness objection is unsupported and unsupportable.**

The SEC has claimed that Watts' subpoena "[o]n its face . . . is overbroad, unreasonable, and places an undue burden on the SEC and its staff."  Ex. 17.  Yet the SEC has done nothing to make the required showing of burden.  See Flanagan, 231 F.R.D. at 102; Athridge v. Aetna Cas. & Surety Co., 184 F.R.D. 181, 191 (D.D.C. 1998).  This failure should end the matter.

Moreover, the record strongly suggests that the SEC could not make that showing, as demonstrated by the fact that a search covering the ten most active years generated just three boxes of documents.  (If the SEC does show that it would be burdensome to extend its search back to 1978, Watts is prepared to agree to limit the request accordingly.  For example, it might be reasonable to limit the scope to a few selected registrants.)

**2.**    **The deliberative-process privilege does not apply to communications with third parties.**

Further illustrating the SEC's offhand approach to its obligations, when the agency did turn up the notes of discussions with various oil companies, it asserted they were shielded by the deliberative-process privilege.  <u>See</u> Ex. 24.  This assertion is unsupported and unsupportable. The deliberative-process privilege simply does not protect information that already is public. Among other reasons, discussion of the Staff Outline with a third party shows that the Staff Outline is having an "operative effect," <u>see</u> <u>Renegotiation Bd.</u>, 421 U.S. at 186-187; demonstrates the absence of any agency interest in keeping the subject matter secret; and independently constitutes waiver of any privilege that might have applied.  <u>See</u> <u>Sears</u>, 421 U.S. at 161.  It is not clear whether the SEC also asserts this privilege with respect to any other third-party communications.  If it does, that objection should fail because the SEC has not provided the required basis and because, as just explained, the privilege cannot apply to such documents.

**C.**    **The  SEC Should Be Required To Provide A Certification And A Privilege Log**

**1.**    **The SEC's assurances that it produced all responsive letters and e-mails repeatedly have been in error.**

The SEC has represented repeatedly that it has searched for and produced all responsive documents.  However, its representations have been contradicted by references, in documents that were produced, to specific documents that should have been produced but were not. Moreover, the steady stream of responsive documents that the SEC later discovered  (for example, the registrant responses to comment letters, and a letter from the Society of Petroleum Engineers that Watts identified to the SEC) further illustrates deficiencies in the agency's search procedures.

Finally, the SEC's representation that it had no record of any conversations with registrants also proved to be wrong.  <u>See</u> Ex. 8 at 2.  After Watts repeatedly challenged that representation, the SEC discovered notes of specific telephone conversations, meetings and other discussions between SEC Staff and registrants.  <u>See</u> Ex. 24 at 1.  After producing these few notes, the SEC again stated that there are no additional such documents.  <u>Id.</u> at 1-2.

**2.      The SEC should certify that it has conducted an appropriate search for responsive documents, and should produce a privilege log.**

In light of this record of errors and gaps, the SEC should be ordered to provide a certification that it has complied with its discovery obligations.  Courts require such certifications when there is reason to believe that production efforts to date have been deficient.  <u>See</u>, <u>e.g.</u>, <u>Commerce & Indus. Ins. Co. v. Grinnell Corp.</u>, Civ. Action No. 97-0775 c/w 97-0803, 98-2200 Section: "R" (4), 2001 U.S. Dist. LEXIS 1441, at *23 (E.D. La. Feb. 2, 2001) (noting that magistrate judge requiring a party to submit written proof that it complied with an order to submit a certification that it had produced all responsive documents) <u>aff'd</u>, 280 F.3d 566 (5th Cir. 2002); <u>United States v. Fesman</u>, 781 F. Supp. 511, 513 (S.D. Ohio 1991) (noting that the Court had issued an order requiring the defendant to comply with the subpoena and submit a certification under penalty of perjury that all responsive documents had been produced).

The certification should state the following:

1) With respect to Requests 1, 2, 3, and 4 contained in Watts' subpoena <u>duces tecum</u> dated February 7, 2006 (a copy of which is attached hereto), the SEC has conducted a search of appropriate files located in each location that is reasonably likely to have responsive documents, and has produced all responsive documents except for documents listed on the SEC's privilege log.

2) With respect to Requests 5, 7, and 8 contained in Watts' subpoena <u>duces tecum</u> of February 7, 2006, limited to to the 25 entities enumerated in the March 1, 2006 letter from Watts' counsel to Kathleen Cody of the SEC,

  i. the SEC has conducted a search of appropriate files located in each location that is reasonably likely to have responsive documents, and has

-21-

           produced all responsive documents (specifically including all responsive communications with the Society of Petroleum Engineers, Total, and Statoil SA) except for documents listed on the SEC's privilege log; and

  ii.  the SEC has searched for, and produced responsive form/boilerplate language used by the agency in its communications with oil and gas registrants concerning proved reserve issues.

3) With respect to Request 6 contained in Watts' subpoena <u>duces</u> <u>tecum</u> of February 7, 2006, the SEC has conducted a search of appropriate files located in each location that is reasonably likely to have responsive documents, and has produced all responsive documents except for documents listed on the SEC's privilege log.

4) The SEC's Division of Corporation Finance does not:

  i.  maintain notes, logs, or other documents that reflect its meetings, discussions, or communications with registrants or other third parties, and has not done so since [SEC to insert date], or

  ii.  require employees to maintain notes, logs, or other documents that reflect its meetings, discussions, or communications with registrants or other third parties, and has not done so since [SEC to insert date].

In addition, as these specific certifications note, the SEC should produce an appropriate privilege log. As required by Rule 45, that log must list all documents within the scope of the subpoena withheld on grounds of privilege, and for each document provide "a description of the nature of the documents . . . not produced that is sufficient to enable [Watts] to contest the claim." Fed. R. Civ. P. 45(d)(2). Although the SEC is obligated to produce this log without being asked, Watts specifically requested this log months ago. Ex. 20 at 4. The SEC still has not produced a log conforming to Rule 45.

## CONCLUSION

For the foregoing reasons, Watts respectfully requests that the Court order the SEC to comply with its obligations under Federal Rule of Civil Procedure 45. A proposed order accompanies this memorandum.


Dated: October 6, 2006

Respectfully submitted,


_____/s/_____
Joseph I. Goldstein (D.C. Bar No. 412240)

Andrew J. Morris (D.C. Bar No. 411865)
Adriaen M. Morse Jr. (D.C. Bar No.483347)
Aimée D. Latimer (D.C. Bar No. 476693)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, DC 20006-1101
Telephone: 202-263-3000
Facsimile: 202-263-3300

*Counsel for Sir Philip B. Watts*

## REQUEST FOR HEARING

Pursuant to Local Rule 7(f), Sir Philip B. Watts hereby requests an oral hearing on the above Motion To Compel Compliance With Rule 45 Subpoena.

Respectfully submitted,


___/s/_____
Joseph I. Goldstein (D.C. Bar No. 412240)

Andrew J. Morris (D.C. Bar No. 411865)
Adriaen M. Morse Jr. (D.C. Bar No. 483347)
Aimée D. Latimer (D.C. Bar No. 476693)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, DC 20006-1101
Telephone: 202-263-3000
Facsimile: 202-263-3300

*Counsel for Sir Philip B. Watts*

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2006, I caused the foregoing Motion to Compel

Compliance By the Securities and Exchange Commission with Rule 45 Subpoena <u>Duces Tecum</u>,

Memorandum in Support, and all accompanying documents, to be served to the following by

overnight delivery:

Richard Humes
Brian G. Cartwright
Kathleen Cody
United States Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-9612

*Counsel for the SEC*


_____/s/_____
Andrew J. Morris
Mayer, Brown, Rowe & Maw LLP
1909 K Street, NW
Washington, D.C.  20006-1101