# EXHIBIT 6



U.S. Securities and Exchange Commission

# Division of Corporation Finance: Frequently Requested Accounting and Financial Reporting Interpretations and Guidance

*Prepared by Accounting Staff Members
in the Division of Corporation Finance
U.S. Securities and Exchange Commission,
Washington, D.C.*

**March 31, 2001**

> The Securities and Exchange Commission disclaims responsibility for any private publication or statement of any of its employees. This outline was prepared by members of the staff of the Division of Corporation Finance, and does not necessarily reflect the views of the Commission, the Commissioners, or other members of the staff.

**CONTENTS**

I.  **Guidance About Accounting Rules**

　　A.  Redeemable Equity Securities

　　B.  Accounting for Advertising Costs

　　C.  Selection of Discount Rates under SFAS 87 and 106

　　D.  Changes in Functional Currency

　　E.  Accounting for Investment Securities

　　F.  Reverse Acquisitions -- Accounting Issues

　　G.  Revenue and Cost Recognition in Co-Marketing Arrangements

　　H.  Write-Offs of Prepayments for Services, Occupancy or Usage

　　I.  Internal Costs Associated with an Acquisition

　　J.  Accounting for Extended Warranty Plans

　　K.  SFAS 45 Guidance Limited to Franchise Agreements

II.  **Guidance About Disclosures**

　　A.  General Guidance about New Accounting Standards

　　　　1.  Before Adoption by the Registrant

　　　　2.  Adoption of New Standard in Interim Period

　　B.  Disclosures Regarding the Realization of a Deferred Tax Asset

　　C.  Disclosure of Non-GAAP Measures Such as "EBITDA"

　　D.  Disclosures by Issuers of "Targeted Stock"

- E. Disclosures by Electric Utilities
- F. Issues in the Extractive Industries
  1. Mining Exploration Costs
  2. Accounting for Inventories Above Cost
  3. Definition of Proved Reserves
  4. Goodwill and Purchase Business Combinations
  5. Applicability of SFAS 121
  6. Changes to Rates of Depreciation, Depletion and Amortization
  7. Full-Cost Accounting
  8. Cash Flows Statements
  9. Hedging Transactions
  10. Exploration Stage (Development Stage) Mining Companies
- G. Accounting and Disclosure for Rollups of Businesses (SAB 97)
  1. Identification of an Accounting Acquirer
  2. Accounting for Shares Issued to Founders of Newco
  3. Valuation of Shares Issued in the Combination
  4. Financial Statement Requirements
- H. Reporting by Hotel Management Companies
- I. Credit Linked Securities of Bank Subsidiaries
- J. Disclosures about Foreign Operations and Foreign Currency Transactions
- K. Industry Guide 3 - Banks and Similar Lending Businesses
- L. Industry Guide 6 - Property Casualty Reinsurance Disclosures

**III. Guidance About Financial Statement Requirements**
- A. Financial Statements Of Operating Real Estate Properties Acquired
  1. Basic Exchange and Securities Act Requirements
  2. Additional Requirements Applicable to "Blind Pools"
  3. Properties Subject to Long-Term Net Lease
- B. Financial Statements of Businesses Contributed to Joint Venture
- C. Financial Statements for Acquired Oil & Gas Producing Properties
- D. Financial Statements in Hostile Takeover Situations
- E. Third Party Credit Enhancements
- F. Reverse Acquisitions -- Reporting Issues
- G. Accountants' Refusals to Re-issue Audit Reports

**IV. Guidance Applicable to Initial Public Offerings**
- A. Distributions to Promoters/Owners at or prior to Closing of IPO
- B. Other Changes in Capitalization at or Prior to Closing of IPO
- C. Accounting for Shares Placed in Escrow in Connection with an IPO
- D. Financial Statements of Acquired Businesses

**V. Division Employment Opportunities for Accountants**

  A. Staff Accountant
  B. Professional Accounting Fellowships
  C. Professional Academic Fellowships

# I. Guidance About Accounting Rules

## A. Redeemable Equity Securities

Commission releases and staff accounting bulletins (Rule 5-02 of Regulation S-X, Financial Reporting Codification Section 211, SAB 3C, and SAB 6B(1)) describe the accounting and reporting that is applicable to mandatorily redeemable preferred stock. The staff considers that guidance to be applicable to *all* equity securities (not only preferred stock) the cash redemption of which is outside the control of the issuer, including stock subject to rescission rights.

Redeemable equity securities should be presented separately from "stockholders' equity" if they are redeemable at the option of the holder, or at a fixed date, or redemption is otherwise beyond the control of registrant. (See also EITF 96-13 concerning the need to classify certain puttable securities as liabilities.) This presentation is required even if the likelihood of the redemption event is considered remote. Where material, disclosures should include title of security, carrying amount, and redemption amount on the face of balance sheet. In notes, disclose general terms, redemption requirements in each of the succeeding five years, and number of shares authorized, issued and outstanding.

Redeemable securities are recorded initially at their fair value. If redeemable currently, the security should be adjusted to its redemption amount at each balance sheet date. If the security will become redeemable at a future determinable date, the security should be accreted in each period to the ultimate contractual redemption amount using an appropriate methodology, usually the interest method. The resulting increases or decreases in the carrying amount of the redeemable security reduce or increase income applicable to common shareholders in the calculation of EPS [SAB 3C]. Any extinguishment of redeemable securities for consideration that exceeds the carrying amount of the securities at that time should be treated as a reduction of income applicable to common shareholders. If charges or credits are material to income, separate disclosure of income applicable to common shareholders on the face of the income statement is required [SAB 6B(1)].

In some cases, the feature of the equity security that makes it redeemable is characterized as a "liquidation event." Ordinary liquidation events, which involve the redemption and liquidation of all equity securities, do not result in a security being classified as redeemable equity. However, "deemed" liquidation events that would require one or more particular classes or types of equity security to be redeemed cause those securities to be classified outside of permanent equity. Examples of deemed liquidation events that we have seen as requiring the redemption of preferred stock and such redemption is beyond the control of the registrant include the following:

- a change in control
- delisting from a stock exchange

the specialized accounting and reporting principles for franchise agreements without comprehensive reconsideration of that guidance in the context of broader principles of revenue recognition which are generally acceptable for other arrangements. Service contracts and agreements authorizing sales representatives and distributorships generally are not within the scope of SFAS 45.

Top

## II. Guidance About Disclosures

### A. General Guidance about New Accounting Standards

#### 1. Before Adoption by the Registrant

Staff Accounting Bulletin 74 (Topic 11:M) discusses disclosures that a registrant should provide in its financial statements and/or MD&A regarding the impact that recently issued accounting standards will have on its financial statements when the standard is adopted in a future period. Disclosures that should be considered include a brief description of the standard and its anticipated adoption date, the method by which the standard will be adopted, the impact that the standard will have on the financial statements to the extent reasonably estimable, and any other effects that are reasonably likely to occur (*e.g.*, changes in business practices, changes in availability or cost of capital, violations of debt covenants, etc.). In this regard, registrants should consider the effects of not only standards recently issued by the FASB, but also Statements of Position and Practice Bulletins issued by the AICPA and consensus positions of the EITF.

#### 2. Adoption of New Standard in Interim Period

Rule 10-01(a)(5) of Regulation S-X permits registrants to omit from interim reports on Form 10-Q footnote disclosures that would be repetitive of information included in the annual financial statements, except that disclosures about material contingencies must always be furnished. The rule also indicates that if events occur subsequent to the fiscal year-end, such as a change in accounting principles and practices, informative disclosure shall be made. Registrants should describe the accounting change and its impact pursuant to APB 28, as amended by SFAS 3. In addition, the staff believes the interim financial statements should include, to the extent applicable, all disclosures identified by the adopted standard as required to be included in annual financial statements. If the change in accounting principle is made in a period other than the first quarter of the year, no amendment of prior filings is required; however, a restatement of each of the prior quarter's results should be included in the filing for the quarter in which the new accounting principle is adopted pursuant to SFAS 3. If the new accounting principle is applied retroactively to prior years, the prior comparable interim quarters should be presented on a restated basis also.

### B. Disclosures Regarding the Realization of a Deferred Tax Asset

SFAS 109 ("Accounting for Income Taxes") requires recognition of future tax benefits attributable to tax net loss carryforwards and deductible temporary differences between financial statement and income tax bases of assets and liabilities. Deferred tax assets must be reduced by a valuation allowance if, based on the weight of available evidence, it is more likely than not that some portion or all of the benefits will not be realized. Notes to financial statements must disclose the amount of the valuation allowance and changes therein.

If a registrant has recognized a net deferred tax asset that is material, it may be necessary to discuss uncertainties surrounding realization of the asset and material

assumptions underlying management's determination that the net asset will be realized. If the asset's realization is dependent on material improvements over present levels of consolidated pre-tax income, material changes in the present relationship between income reported for financial and tax purposes, or material asset sales or other nonroutine transactions, a description of these assumed future events, quantified to the extent practicable, should be furnished in the MD&A. For example, the minimum annualized rate by which taxable income must increase during the tax NOL carryforward period should be disclosed if realization of the benefit is dependent on taxable income higher than currently reported. Also, if significant objective negative evidence indicates uncertainty regarding realization of the deferred asset, the countervailing positive evidence relied upon by management in its decision not to establish a full allowance against the asset should be identified.

Conversely, a valuation allowance for the deferred tax asset is not appropriate unless it is more likely than not that the asset will not be realized. The staff has challenged registrants that establish a significant allowance but whose disclosures regarding current and expected operating results appear inconsistent with management's view regarding realization of the deferred tax asset. In those circumstances, the staff has questioned whether the narrative disclosures are unreasonably optimistic or the valuation allowance is unreasonably pessimistic, and revisions to the financial statements or the narrative typically have been necessary to reconcile the apparent inconsistency.

Material changes in the allowance for realization of a deferred tax asset from one period to the next should be fully explained in MD&A, highlighting changes in assumptions and environmental factors that necessitated the change.

### C. Disclosure of Non-GAAP Measures Such as "EBITDA"

Some registrants choose to present a non-GAAP financial measure such as EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) or FFO (funds from operations) in their disclosure documents. Although such measures can be useful in some circumstances, an unbalanced presentation can be confusing and lead to undue reliance on the measure by investors. Problems associated with presentations of non-GAAP measures were highlighted by the Commission in Accounting Series Release No. 142. Some comments cited frequently by the staff include the following:

1. A non-GAAP measure should be presented in a manner that does not give it greater authority or prominence than conventionally computed earnings or cash flows as reported in the GAAP financial statements. For example, the staff recommends that EBITDA and similar measures be located within an "other data" section in selected financial data. Discussions in MD&A of results as measured in the GAAP financial statements should be no less complete than discussions of performance or liquidity as depicted by non-GAAP measures.

2. Wherever the non-GAAP measure is used, a footnote or other reference to a complete explanation of its calculation and components should be provided. Since all companies and analysts do not calculate these non-GAAP measures in the same fashion, the staff recommends that the footnote or other disclosure alert investors to the fact that the measure presented may not be comparable to similarly titled measures reported by other companies.

3. Management should consider how any non-GAAP measure is expected to be used by investors, identify significant factors that should be considered, and discuss significant trends or requirements not captured by the measure to ensure balance and avoid undue reliance on the measure. Notwithstanding disclosures by competitors or requests from financial analysts, the staff believes that non-GAAP measures generally should be avoided unless management itself believes that the measure provides relevant and useful information.

4. Non-GAAP measures that measure cash or "funds" generated by operations (liquidity) should be balanced with equally prominent disclosure of amounts from the statement of cash flows (cash flows from operations, investing and

financing activities) and, in some cases, the ratio or deficiency of earnings to fixed charges. Explanation may be necessary to the extent that funds depicted by the measure are not available for management's discretionary use (due to legal or functional requirements to conserve funds for capital replacement and expansion, debt service and balloon maturities, deferred interest and dividend payments, and other commitments and uncertainties).

5. A frequent disclosure issue is the use of a non-GAAP measure in a discussion of operating performance when the measure is primarily a measure of liquidity, capital resources, or debt service capacity. For example, calculations that depict an adjusted or normalized measure of working capital or funds generated by operations and available to meet capital and debt requirements often are presented inappropriately as if they should be used as alternative measures of earnings, return on investment or similar performance or efficiency factors. In that case, the staff will request the measure's presentation in an appropriate context with clarification of its expected use.

6. If management is presenting the non-GAAP calculation as an alternative or pro forma measure of **performance**, the staff discourages adjustments to eliminate or smooth items characterized as nonrecurring, infrequent or unusual. Different unusual items are likely to occur every period, and companies and investors may differ as to what types of events warrant adjustment. Trends may be distorted and disclosure unbalanced if only certain items are adjusted while the effects of other infrequent events or transactions (whether favorable or unfavorable) are not considered or highlighted. Of course, all such special items should be highlighted in the registrant's disclosures to permit analysis by investors. Where management intends the measure to be indicative of **liquidity** and communicates that use through the context of its presentation, the staff ordinarily will not object to adjustment for non-cash charges relating to special items if it is meaningful to investors in the circumstances.

### D. Disclosures by Issuers of "Targeted Stock"

*Overview*

Some registrants have issued classes of stock which they characterize as "targeted" or "tracking" stock because they are referenced in some manner to a specific business unit, activity or assets of the registrant. The staff is concerned that the style and content of disclosures about the operations referenced by a class of common stock may give the inaccurate impression that the investor has a direct or exclusive financial interest in that unit.

Notwithstanding the title given to a particular class of stock, an investor in any of a registrant's classes of common stock has a financial interest only in the residual net assets of the registrant, allocated among the shareholder classes in accordance with the formulae stipulated in the corporate charter. Assets and income attributed to units referenced by each class typically are available to all of the registrant's creditors, and even other classes of shareholders, in the event of liquidation. While dividends declared on each class may not exceed some measure of the performance of the referenced business unit, no dividends need be declared at all. Moreover, the dividend declaration policies typically are subject to change and need bear no relationship to the relative performance of the referenced businesses. Methods and assumptions that can significantly affect measurement of the referenced unit's performance typically can be changed at any time without the consent of the security holders.

*Characterizations of the security as "tracking" a business unit*

If no term of the targeted stock requires or assures that potential distributions will correlate with the performance of the business unit nominally associated with the security, implications that the market value of the security will "track," or is otherwise linked with, a business unit are subject to challenge. The staff has asked registrants to explain in their filings why the formula for determining the amount

available for dividends (or any other term or feature of the security) can be expected to link in some fashion the market value of a class of common stock with the value or performance of any subpart of the registrant, or state clearly that management does not intend to imply such a linkage.

### *Recommended approach to disclosure about targeted stock*

While the staff encourages robust disclosure about the registrant's operating segments, presenting information about the referenced businesses as if distinct from the registrant may confuse investors about the nature of the security. We believe companies should integrate discussions and quantitative data about the referenced business units more closely within a comprehensive discussion of the registrant's financial condition and operating results. While schedules or condensed financial information demonstrating the calculation of earnings available for each class of the registrant's common stock are relevant, more extensive presentations can be misunderstood and should be reconsidered. If a company chooses to present more than condensed financial data, the staff has recommended that companies present no greater detail than "consolidating financial statements" that include the referenced businesses together with the financial statements of the registrant. That presentation would show explicitly how management and the board have allocated and attributed revenues, expenses, assets, liabilities, and cash flows, but will not necessarily reflect earnings applicable to the different classes of stock due to features of the allocation formula which are incompatible with GAAP.

### *Use of separate full financial statements for a referenced business unit*

Notwithstanding our recommendation to the contrary, some issuers of targeted stock have chosen to present complete separate audited financial statements of the referenced units. In this case, the staff believes that financial statements of the referenced unit furnished to investors should be accompanied always by financial statements of the registrant, as issuer of the security. Most auditors will permit use of their report on the financial statements of the referenced business only in those circumstances. EPS of one class of stock should not be presented alone or within the separate financial statements of the referenced business security because that business did not issue the security. EPS with respect to any class of the issuer's securities should be presented only with the issuer's consolidated financial statements or with its related consolidated information.

### *Consequences of formula-based financial statements*

In some cases, separate financial statements presented in an issuer's filing do not appear to be an actual business or division, but rather an elaborate depiction of the earnings allocation formula for a class of stock, as if those legal terms defined an accounting entity. For example, sometimes that formula results in the depiction of one of the issuer's businesses as if it had a financial interest in another of its businesses. Financial statements prepared in accordance with the dictates of management, the board and the corporate charter for the purpose of measuring earnings available to a class of shareholders do not necessarily present fairly the financial condition, cash flows and operating results of an actual business unit within the registrant.

The staff has raised a number of questions in these circumstances: Do financial statements based on these formulae comply with GAAP? Does the association of the auditor with these presentations give unwarranted comfort to investors about the fairness to the different shareholder groups of management's assignment of revenues and expenses and its allocation of capital and other costs. Are the financial statements "special purpose" financial statements that are prepared on a basis of accounting prescribed in a contractual agreement, requiring special considerations for disclosure and auditor association?

### *Non-GAAP measures of performance*

In some cases, the terms of the targeted stock stipulate explicitly that the

performance of the unit will be measured on a basis that departs from GAAP. Any measurement, classification, allocation or disclosure that departs from GAAP but is necessary to measure or explain amounts available for dividends on stock referenced to the unit should be depicted separately from presentations that are purported to be in accordance with GAAP. An amount should not be labeled as "net income" unless it is calculated in accordance with GAAP. If the financial statements of the unit are purported to be in accordance with GAAP, management should ensure that all information essential for a fair presentation of the entity's financial position, results of operations, and cash flows in conformity with GAAP is set forth in the financial statements. Failure to include all such information should result in a qualification of the auditor's report on the unit's financial statements.

***Cost allocations***

The units referenced by the targeted stock may share many common costs, such as general and administrative and interest costs. As required by SAB Topic 1B, a complete description of any allocation methods used for cash, debt, related interest and financing costs, corporate overhead, and other common costs should be provided in the notes to the financial statements that purport to be prepared in accordance with GAAP. The amounts likely to be reported by the entity were it a stand-alone entity should be disclosed. In some cases, the staff has questioned whether allocations have been biased. For example, operating results and EPS of operations that are valued on the basis of earnings could be unfairly inflated as a result of excessive allocations of common costs to operations that are valued on the basis of revenue growth. If the methodologies and assumptions underlying the allocations of debt and corporate expenses may change without securityholder approval, that fact should be stated clearly. If the financial statements of the business unit before and after the issuance of the tracking stock will not be comparable, that fact should be disclosed. On occasion, the staff has questioned whether a change in the method of attributing revenue or expense from one shareholder group to another would be reported as a change in reporting entity or, if deemed a change in estimate or principle, how the auditor will determine whether a change is a "better" method of calculating earnings attributable to a particular shareholder group.

***Other disclosure issues***

Other areas of disclosure that are of particular significance for issuers of targeted stock include the following:

- Policies for the management of cash generated by and capital investment in the referenced units, and for the pricing of "transactions" between the referenced units.

    - Conflicts of interest.

    - Effects of corporate events (mergers, tender offers, changes in control, adverse tax rulings, liquidation) on rights of the security holders.

    - Terms under which one class may be converted into another class.

    - Effects of changes in relative market values of the registrant's outstanding classes of stock on rights of the security holders.

### E. Disclosures by Electric Utilities

Electric utility companies are facing increasing competition. The regulatory framework in which they operate is undergoing significant change, although the path and pace of that change vary from jurisdiction to jurisdiction. Clear and balanced disclosure is necessary to inform investors about the specific risks and uncertainties that are reasonably likely to affect the reporting company. Consequences of the competitive and regulatory changes may include impairment of significant recorded assets, material reductions of profit margins, and increased

costs of capital. Those risks, quantified to the extent practicable, should be discussed in MD&A.

Many regulated utilities account for costs differently from other public companies. Under SFAS 71, a utility may defer certain costs of providing services if the rates established by its regulators are designed to recover the utility's specific costs and the economic environment gives reasonable assurance that those rates can be charged and collected throughout the periods necessary to recover the costs. When a utility ceases to operate under those conditions, significant costs previously deferred under SFAS 71 as regulatory assets must be written off and methods of amortizing capital assets must be revised to conform with lives appropriate in a competitive environment. The resulting reduction in reported equity and operating margin, accompanied by the increased market risks, may create new requirements for equity capital and push borrowing costs higher. While some companies may be affected only marginally in the next several years, others may suffer serious financial consequences.

Disclosures responsive to Item 101 (Description of Business) of Regulation S-K include a description of the competitive conditions faced by the registrant and material features of its regulatory environment. Item 303 (Management's Discussion and Analysis) requires meaningful explanation of how changes in competition and rate setting practices have affected or are reasonably likely to affect operating results. If recovery of identifiable categories of capital assets, regulatory assets or other deferred costs is subject to material uncertainties, quantitative disclosure is warranted.

For example, if the registrant has submitted information to state and/or federal regulators in an effort to implement special rate and/or depreciation plans, the staff believes that a description of those plans, including the type and amount of potentially "stranded" costs identified in those plans, should be discussed in MD&A. Potentially stranded investments and costs commonly include differences between regulatory accumulated depreciation for plant and the accumulated depreciation which would have been recorded based on generally accepted accounting principles, and expected or estimated differences between the carrying amount of plant assets and the amount that would be recoverable in a deregulated environment.

Avoiding boilerplate or overly general disclosures, the registrant should identify specific segments or customer classes that are most likely to be affected by regulatory or competitive changes, and describe clearly how specific assets, revenues and operating margins may be affected. For example, registrants should disclose the relative proportion of operations affected by special non-traditional rate plans with specific groups of customers, including industrial customers, and quantify to the extent practicable the current and expected impact of those arrangements. Regulatory developments and uncertainties unique to individual significant jurisdictions should be highlighted, and any material effects that are reasonably likely to occur should be discussed and quantified. Required disclosures in financial statements about accounting policies governing cost deferral and depreciation may warrant additional explanation in MD&A if unique or unusual practices materially affect reported results or the loss of eligibility to use the accounting method is reasonably likely and would have a material effect.

## F. Issues in the Extractive Industries

### 1. Mining Exploration Costs

Recoverability of capitalized costs is likely to be insupportable under FASB Statement No. 121 prior to determining the existence of a commercially minable deposit, as contemplated by Industry Guide 7 for a mining company in the exploration stage. As a result, the staff would generally challenge capitalization of exploration costs, and believes that those costs should be expensed as incurred during the exploration stage under US GAAP.

### 2. Accounting for Inventories Above Cost

Only in exceptional cases may inventory properly be stated at an amount above cost. Accounting Research Bulletin (ARB) No. 43, *Restatement and Revision of Accounting Research Bulletins,* cites the exceptional example of precious metals having a fixed monetary value with no substantial cost of marketing. That guidance goes on to specify criteria that must be met by any inventory carried above its cost:

- inability to determine appropriate approximate costs;

- immediate marketability at quoted market price; and

- unit interchangeability.

Only when all these criteria are met should management consider accounting for inventory at amounts above cost. The staff believes the criteria in ARB 43 are even more rarely satisfied today than in 1953 when ARB 43 was published. For example, the availability of sophisticated cost accounting techniques and supporting software suggests that few, if any, registrants are unable to approximate the appropriate cost of inventory.

Also, the criteria of "immediately marketability" and "unit interchangeability" are not met by items that are in-process and not yet in final marketable form. For example, until precious or base metals are in the final refined state in which they are typically marketed, the items are not immediately marketable nor do they have the characteristic of unit interchangeability. Mined ore, yet to be subjected to refining or smelting processes, should not be carried at an amount above cost.

Registrants should ensure that their accounting policies for in-process inventory conform to the guidance in ARB 43. SAB 101 reminds registrants that authoritative literature takes precedence over industry practice that is contrary to generally accepted accounting principles.

### 3. Definition of Proved Reserves

Over the last several years, the estimation and classification of petroleum reserves has been impacted by the development of new technologies such as 3-D seismic interpretation and reservoir simulation. Computer processor improvements have allowed the increased use of probabilistic methods in proved reserve assessments. These have led to issues of consistency and, therefore, some confusion in the reporting of proved oil and gas reserves by public issuers in their filings with the Commission. This section discusses some issues the Division of Corporation Finance's engineering staff has identified in its review of such filings.

The definitions for proved oil and gas reserves for the SEC are found in Rule 4-10(a) of Regulation S-X of the Securities Exchange Act of 1934. The SEC definitions are below in bold italics. Under each section we have tried to explain the SEC staff's position regarding some of the more common issues that arise from each portion of the definitions. As most engineers who deal with the classification of reserves have come to realize, it is difficult, if not impossible, to write reserve definitions that easily cover all possible situations. Each case has to be studied as to its own unique issues. This is true with the Society of Petroleum Engineers' and others' reserve definitions as well as the SEC's definitions.

(a) *Proved oil and gas reserves are the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided by contractual arrangements, but not on escalations based upon future conditions.*

The determination of reasonable certainty is generated by supporting geological and engineering data. There must be data available which indicate that assumptions such as decline rates, recovery factors, reservoir limits, recovery mechanisms and volumetric estimates, gas-oil ratios or liquid yield are valid. If the area in question is

new to exploration and there is little supporting data for decline rates, recovery factors, reservoir drive mechanisms etc., a conservative approach is appropriate until there is enough supporting data to justify the use of more liberal parameters for the estimation of proved reserves. The concept of reasonable certainty implies that, as more technical data becomes available, a positive, or upward, revision is much more likely than a negative, or downward, revision.

Existing economic and operating conditions are the product prices, operating costs, production methods, recovery techniques, transportation and marketing arrangements, ownership and/or entitlement terms and regulatory requirements that are extant on the effective date of the estimate. An anticipated change in conditions must have reasonable certainty of occurrence; the corresponding investment and operating expense to make that change must be included in the economic feasibility at the appropriate time. These conditions include estimated net abandonment costs to be incurred and duration of current licenses and permits.

If oil and gas prices are so low that production is actually shut-in because of uneconomic conditions, the reserves attributed to the shut-in properties can no longer be classified as proved and must be subtracted from the proved reserve data base as a negative revision. Those volumes may be included as positive revisions to a subsequent year's proved reserves only upon their return to economic status.

(b) Reservoirs are considered proved if economic producibility is supported by either actual production or conclusive formation test. The area of a reservoir considered proved includes that portion delineated by drilling and defined by gas-oil and/or oil-water contacts, if any, and the immediately adjoining portions not yet drilled, but which can be reasonably judged as economically productive on the basis of available geological and engineering data. In the absence of information on fluid contacts, the lowest known structural occurrence of hydrocarbons controls the lower proved limits of the reservoir.

Proved reserves may be attributed to a prospective zone if a conclusive formation test has been performed or if there is production from the zone at economic rates. It is clear to the SEC staff that wireline recovery of small volumes (e.g. 100 cc) or production of a few hundred barrels per day in remote locations is not necessarily conclusive. Analyses of open-hole well logs which imply that an interval is productive are not sufficient for attribution of proved reserves. If there is an indication of economic producibility by either formation test or production, the reserves in the legal and technically justified drainage area around the well projected down to a known fluid contact or the lowest known hydrocarbons, or LKH may be considered to be proved.

In order to attribute proved reserves to legal locations adjacent to such a well (i.e. offsets), there must be conclusive, unambiguous technical data which supports reasonable certainty of production of such volumes and sufficient legal acreage to economically justify the development without going below the shallower of the fluid contact or the LKH. In the absence of a fluid contact, no offsetting reservoir volume below the LKH from a well penetration shall be classified as proved.

Upon obtaining performance history sufficient to reasonably conclude that more reserves will be recovered than those estimated volumetrically down to LKH, positive reserve revisions should be made.

(c) Reserves which can be produced economically through applications of improved recovery techniques (such as fluid injection) are included in the "proved" classification when successful testing by a pilot project, or the operation of an installed program in the reservoir, provides support for the engineering analysis on which the project or program was based.

If an improved recovery technique which has not been verified by routine commercial use in the area is to be applied, the hydrocarbon volumes estimated to be recoverable cannot be classified as proved reserves unless the technique has been demonstrated to be technically and economically successful by a pilot project or installed program in that specific rock volume. Such demonstration should

validate the feasibility study leading to the project.

(d) Estimates of proved reserves do not include the following:

- oil that may become available from known reservoirs but is classified separately as "indicated additional reserves";

- crude oil, natural gas, and natural gas liquids, the recovery of which is subject to reasonable doubt because of uncertainty as to geology, reservoir characteristics, or economic factors;

- crude oil, natural gas, and natural gas liquids, that may occur in undrilled prospects;

- crude oil, natural gas, and natural gas liquids, that may be recovered from oil shales, coal, gilsonite and other sources.

Geologic and reservoir characteristic uncertainties such as those relating to permeability, reservoir continuity, sealing nature of faults, structure and other unknown characteristics may prevent reserves from being classified as proved. Economic uncertainties such as the lack of a market (e.g. stranded hydrocarbons), uneconomic prices and marginal reserves that do not show a positive cash flow can also prevent reserves from being classified as proved. Hydrocarbons "manufactured" through extensive treatment of gilsonite, coal and oil shales are mining activities reportable under Industry Guide 7. They cannot be called proved oil and gas reserves. However, coal bed methane gas can be classified as proved reserves if the recovery of such is shown to be economically feasible.

In developing frontier areas, the existence of wells with a formation test or limited production may not be enough to classify those estimated hydrocarbon volumes as proved reserves. Issuers must demonstrate that there is reasonable certainty that a market exists for the hydrocarbons and that an economic method of extracting, treating and transporting them to market exists or is feasible and is likely to exist in the near future. A commitment by the company to develop the necessary production, treatment and transportation infrastructure is essential to the attribution of proved undeveloped reserves. Significant lack of progress on the development of such reserves may be evidence of a lack of such commitment. Affirmation of this commitment may take the form of signed sales contracts for the products; request for proposals to build facilities; signed acceptance of bid proposals; memos of understanding between the appropriate organizations and governments; firm plans and timetables established; approved authorization for expenditures to build facilities; approved loan documents to finance the required infrastructure; initiation of construction of facilities; approved environmental permits etc. Reasonable certainty of procurement of project financing by the company is a requirement for the attribution of proved reserves. An inordinately long delay in the schedule of development may introduce doubt sufficient to preclude the attribution of proved reserves.

The history of issuance and continued recognition of permits, concessions and commerciality agreements by regulatory bodies and governments should be considered when determining whether hydrocarbon accumulations can be classified as proved reserves. Automatic renewal of such agreements cannot be expected if the regulatory body has the authority to end the agreement unless there is a long and clear track record which supports the conclusion that such approvals and renewal are a matter of course.

(e) Proved developed oil and gas reserves are reserves that can be expected to be recovered through existing wells with existing equipment and operating methods. Additional oil and gas expected to be obtained through the application of fluid injection or other improved recovery techniques for supplementing the natural forces and mechanisms of primary recovery should be included as "proved developed reserves" only after testing by a pilot project or after the operation of an installed program has confirmed through production response that increased

recovery will be achieved.

Currently producing wells and wells awaiting minor sales connection expenditure, recompletion, additional perforations or bore hole stimulation treatment would be examples of properties with proved developed reserves since the majority of the expenditures to develop the reserves has already been spent.

Proved developed reserves from improved recovery techniques can be assigned after either the operation of an installed pilot program shows a positive production response to the technique or the project is fully installed and operational and has shown the production response anticipated by earlier feasibility studies. In the case with a pilot, proved developed reserves can be assigned only to that volume attributable to the pilot's influence. In the case of the fully installed project, response must be seen from the full project before all the proved developed reserves estimated can be assigned. If a project is not following original forecasts, proved developed reserves can only be assigned to the extent actually supported by the current performance. An important point here is that attribution of incremental proved developed reserves from the application of improved recovery techniques requires the installation of facilities and a production increase.

(f) Proved undeveloped oil and gas reserves are reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage shall be limited to those drilling units offsetting productive units that are reasonably certain of production when drilled. Proved reserves for other undrilled units can be claimed only where it can be demonstrated with <u>certainty</u> that there is <u>continuity of production</u> from the existing productive formation. Under no circumstances should estimates of proved undeveloped reserves be attributable to any acreage for which an application of fluid injection or other improved recovery technique is contemplated, unless such techniques have been proved effective by actual tests in the area and in the same reservoir. (Emphasis added)

The SEC staff points out that this definition contains no mitigating modifier for the word certainty. Also, continuity of production requires more than the technical indication of favorable structure alone (e.g. seismic data) to meet the test for proved undeveloped reserves. Generally, proved undeveloped reserves can be claimed only for legal and technically justified drainage areas offsetting an existing productive well (but structurally no lower than LKH). If there are at least two wells in the same reservoir which are separated by more than one legal location and which show communication (reservoir continuity), proved undeveloped reserves could be claimed between the two wells, even though the location in question might be more than an offset well location away from any of the wells. In this illustration, seismic data could be used to help support this claim by showing reservoir continuity between the wells, but the required data would be the conclusive evidence of communication from production or pressure tests. The SEC staff emphasizes that proved reserves cannot be claimed more than one offset location away from a productive well if there are no other wells in the reservoir, even though seismic data may exist. The use of high-quality, well calibrated seismic data can improve reservoir description for performing volumetrics (e.g. fluid contacts). However, seismic data is not an indicator of continuity of production and, therefore, can not be the sole indicator of additional proved reserves beyond the legal and technically justified drainage areas of wells that were drilled. Continuity of production would have to be demonstrated by something other than seismic data.

In a new reservoir with only a few wells, reservoir simulation or application of generalized hydrocarbon recovery correlations would not be considered a reliable method to show increased proved undeveloped reserves. With only a few wells as data points from which to build a geologic model and little performance history to validate the results with an acceptable history match, the results of a simulation or material balance model would be speculative in nature. The results of such a simulation or material balance model would not be considered to be reasonably certain to occur in the field to the extent that additional proved undeveloped reserves could be recognized. The application of recovery correlations which are not specific to the field under consideration is not reliable enough to be the sole source for proved reserve calculations.

Reserves cannot be classified as proved undeveloped reserves based on improved recovery techniques until such time that they have been proved effective in that reservoir or an analogous reservoir in the same geologic formation in the immediate area. An analogous reservoir is one having at least the same values or better for porosity, permeability, permeability distribution, thickness, continuity and hydrocarbon saturations.

(g) Topic 12 of Accounting Series Release No. 257 of the Staff Accounting Bulletins states:

> In certain instances, proved reserves may be assigned to reservoirs on the basis of a combination of electrical and other type logs and core analyses which indicate the reservoirs are analogous to similar reservoirs in the same field which are producing or have demonstrated the ability to produce on a formation test.

If the combination of data from open-hole logs and core analyses is overwhelmingly in support of economic producibility and the indicated reservoir properties are analogous to similar reservoirs in the same field that have produced or demonstrated the ability to produce on a conclusive formation test, the reserves may be classified as proved. This would probably be a rare event especially in an exploratory situation. The essence of the SEC definition is that in most cases there must at least be a conclusive formation test in a new reservoir before any reserves can be considered to be proved.

(h) Statement of Financial Accounting Standards 69, paragraph 30.a. requires that "Future cash inflows . . . be computed by applying year-end prices of oil and gas relating to the enterprise's proved reserves to the year-end quantities of those reserves. This requires the use of physical pricing determined by the market on the last day of the (fiscal) year. For instance, a west Texas oil producer should determine the posted price of crude (hub spot price for gas) on the last day of the year, apply historical adjustments (transportation, gravity, BS&W, purchaser bonuses, etc.) and use this oil or gas price on an individual property basis for proved reserve estimation and future cash flow calculation (this price is also used in the application of the full cost ceiling test). A monthly average is not the price on the last day of the year, even though that may be the price received for production on the last day of the year. Paragraph 30b) states that future production costs are to be based on year-end figures with the assumption of the continuation of existing economic conditions.

(i) Probabilistic methods of reserve estimating have become more useful due to improved computing and more important because of its acceptance by professional organizations such as the SPE. The SEC staff feels that it would be premature to issue any confidence criteria at this time. The SPE has specified a 90% confidence level for the determination of proved reserves by probabilistic methods. Yet, many instances of past and current practice in deterministic methodology utilize a median or best estimate for proved reserves. Since the likelihood of a subsequent increase or positive revision to proved reserve estimates should be much greater than the likelihood of a decrease, we see an inconsistency that should be resolved. If probabilistic methods are used, the limiting criteria in the SEC definitions, such as LKH, are still in effect and shall be honored. Probabilistic aggregation of proved reserves can result in larger reserve estimates (due to the decrease in uncertainty of recovery) than simple addition would yield. We require a straight forward reconciliation of this for financial reporting purposes.

(j) The calculation of the standardized measure of discounted future net cash flows relating to oil and gas properties must comply with paragraph 30 of SFAS 69. The effects of income taxes, like all other elements of the measure, must be discounted at the standard rate of 10% pursuant to paragraph 30(e). The "short-cut" method for determining the tax effect on the ceiling test for companies using the full-cost method of accounting, as described in SAB Topic 12:D:1, Question 2, may not be used for purposes of the paragraph 30 calculation of the standardized measure.

(k) We have seen in press releases and web sites disclosure language by oil and gas

companies which would not be allowed in a document filed with the SEC. We will request that any such disclosures be accompanied by the following cautionary language:

> Cautionary Note to U.S. Investors -- The United States Securities and Exchange Commission permits oil and gas companies, in their filings with the SEC, to disclose only proved reserves that a company has demonstrated by actual production or conclusive formation tests to be economically and legally producible under existing economic and operating conditions. We use certain terms {in this press release/on this web site}, such as [identify the terms], that the SEC's guidelines strictly prohibit us from including in filings with the SEC. U.S. Investors are urged to consider closely the disclosure in our Form XX, File No. X-XXXX, available from us at [registrant address at which investors can request the filing]. You can also obtain this form from the SEC by calling 1-800-SEC-0330.

Examples of such disclosures would be statements regarding "probable," "possible," or "recoverable" reserves among others.

(l) Under Production Sharing Agreements, a host government typically retains the title to the hydrocarbons in place, although the contracting company usually assumes all the costs for exploration and carries all risks. When a discovery is made, the contract provides for the contracting company to recover all its exploration and development expenditures and receive a share of profits, subject to certain limits. The amounts due to the contracting company are typically taken in kind.

In general, two methods of determining oil and gas reserves under production sharing arrangements have been proposed by registrants: (a) the working interest method and (b) the economic interest method. Under the working interest method, the estimate for total proved reserves is multiplied by the respective working interest held by the contracting company, net of any royalty. Under the economic interest method, the company's share of the cost recovery oil revenue and the profit oil revenue is divided by the year-end oil price, which represents the volume entitlement. The lower the oil price, the higher the barrel entitlement, and vice versa.

Reserve volumes determined by various owners should add up to 100% of the total field reserves, but that is not always the case using the working interest method. If the working interest is different from the profit entitlement, the economic interest method is the method acceptable to the staff because it is a closer representation of the actual reserve volume entitlement that can be monetized by a company. Also, use of the economic interest method avoids violating the prohibition in paragraph 10 of SFAS 69 against reporting reserves owned by others.

(m) The SEC staff reminds professionals engaged in the practice of reserve estimating and evaluation that the Securities Act of 1933 subjects to potential civil liability every expert who, with his or her consent, has been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation used in connection with the registration statement. These experts include accountants, attorneys, engineers or appraisers.

### 4. Goodwill and Purchase Business Combinations

The staff often has challenged recognition of goodwill in acquisitions of entities whose dominant business is the ownership and operation of oil and gas or mineral properties. In the absence of other substantial business activities, the staff presumes that substantially all the value of the acquired entity not otherwise accounted for by tangible and identifiable intangible assets is derived from the value of the mineral or oil and gas reserves owned by that entity. In these business combinations, the purchase price ordinarily should be allocated entirely to the properties and other net tangible and identifiable intangible assets acquired, with no allocation to goodwill. However, if an excess purchase price is clearly indicated by