# EXHIBIT 7

**LYNCH KEEFE BARTELS**
**Attorneys at Law**
John E. Keefe, Jr. (JK-9786)
Stephen T. Sullivan, Jr. (SS-7343)
830 Broad Street
Shrewsbury, NJ 07702
Telephone: 732-224-9400

**Liaison Counsel for the Class**

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Stanley D. Bernstein
Jeffrey M. Haber
William A. K. Titelman
Mark T. Millkey
Michael S. Bigin
10 East 40th Street
New York, NY 10016
Telephone: 212-779-1414

**Counsel for PSERS and SERS, and**
**Lead Counsel for the Class**

[*Additional counsel listed on signature page*]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE ROYAL DUTCH/SHELL TRANSPORT SECURITIES LITIGATION ) ) ) ) ) ) ) ) ) | Civ. Action No. 04-374 (JAP) (Consolidated Cases) Hon. Joel A. Pisano **JURY TRIAL DEMANDED** *(Document electronically filed)* |

## SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

NV falsely represented that each had conducted their respective audits "in accordance with U.S. generally accepted auditing standards ('GAAS')." They also falsely represented that the audited financial statements presented fairly the financial position of the Shell Group, Shell Transport, and Royal Dutch as of December 31, 1998-2002, and their results of operations and cash flows for each of those years in accordance with generally accepted accounting principles ("GAAP") in the Netherlands and the United States.

6.    The truth about the Shell Group's proved reserves and its effect on the Shell Group's reported financial results began to be disclosed on January 9, 2004. That day, before the markets opened in Europe, the Companies shocked the investing public by announcing that, in order to comply with SEC regulations, they would be reducing previously reported proved reserves by 20%, or approximately 3.9 billion boe. The disclosure, made in a release entitled "proved reserve recategorisation," triggered a substantial decline in the trading price of the ordinary shares of both Shell Transport and Royal Dutch and the ADRs of Shell Transport (Shell Transport dropping by about 6.96% in the United States and 7.48% in London, and Royal Dutch dropping by about 7.87% in the United States and 7.65% in Amsterdam). The Companies lost $13.84 billion of market value as a result of this disclosure.

7.    Investors and analysts were shocked by the Shell Group's "bombshell" revelations. According to scores of articles appearing in the news media over the next several weeks, investors were "blind-sided" by the disclosure of the reclassification, which analysts termed "staggering." The Shell Group's reputation and credibility with market analysts and institutional investors were severely damaged. For example, Morgan Stanley wrote: "The shares have come down 20% in the past six weeks and that is all to do with credibility. While investors have seen Shell as the

most conservative of companies, it turns out that it is not what we thought. The market is traumatised and shocked."

8.      Since the initial announcement on January 9, the Shell Group has further reduced its estimated proved oil and natural gas reserves three additional times – on March 18, April 19, and May 24, 2004 – for a total reclassification of 4.47 billion boe, or 23%.

9.      Strikingly, the Companies booked reserves as proved in some areas of the world when their partners in the same projects did not. In Australia, for example, the Companies booked approximately 557 million boe of natural gas from the Gorgon fields as proved as of December 31, 1997, more than six years ago. To date, neither of their co-venturers in the Gorgon project, ChevronTexaco and ExxonMobil, has booked even a single cubic foot of Gorgon natural gas as proved.

10.      In addition to market losses, the fraud alleged herein has resulted in the impairment of the Shell Group's corporate credit ratings, the restatement of the Shell Group's reported financial results, and the firing of Defendants Sir Philip Watts ("Watts), Walter van de Vijver ("van de Vijver"), and Judith Boynton ("Boynton") from their senior executive positions within the Group. (Boynton now reportedly acts as an "advisor" to the Shell Group.)

11.      The severity of the January reclassification has also caused regulatory agencies to commence investigations into the matter; four civil investigations by regulatory authorities in the United States and Europe have been commenced, as was a criminal investigation by the U.S. Department of Justice. Former SEC chief accountant Lynn Turner was quoted in a January 12, 2004 article in THE WALL STREET JOURNAL (entitled "Shell Cuts Reserve Estimate 20% as SEC Scrutinizes Oil Industry"), opining that the reclassification was not a mistake: "A 20% restatement of proven reserves is a humongous error. For a company like Shell to have missed its

estimating proved reserves in "immature" fields, but applied more
deterministic methods in "mature" fields, directing OUs to increase
proved reserves in such fields to equal "expectation" volumes.

123.    As the SEC explained, "[a]n oil and gas reserves estimation methodology is
considered 'probabilistic' when the known geological, engineering and economic data are used to
generate a range of estimates and their associated probabilities." "An oil and gas reserves
estimation methodology is considered 'deterministic' if a single best estimate of reserves is made
based on known geological, engineering and economic data."

124.    The Companies used the term "expectation reserves" to mean "the most likely
estimate of hydrocarbon volumes remaining to be recovered from a project that is technically and
commercially mature, or from a producing asset." As noted by the SEC, "[i]f probabilistic
techniques are used in reserve estimation, the expectation reserves are the probability weighted
average of all possible outcomes (common referred to as the 'P50' outcome). If deterministic
techniques are used, expectation reserves correspond to most likely estimate of future recovery."
As a general matter, the Shell Group classified a field as "mature" under the revised guidelines if
total production was greater than 30% of expectation reserves.

125.    This practice deviated from the Shell Group's early 1990s practice, as set forth in
the Companies' reserve-booking guidelines (a two-volume document updated each year), that
permitted executives to book proved reserves only if the Shell Group had signed a sales contract
for the oil or gas.

126.    As revealed in the news media, the GAC Report, the Notice to Take Action, and
the Cease and Desist Order, the new guidelines significantly inflated the Shell Group's reserves
by enabling executives to book proved reserves well before making significant investments to get
the oil and gas out of the ground. For example, as noted by the SEC, "nearly 40% of the total

proved reserves Shell added in 1998 resulted from this guideline revision." For the two years

ended December 31, 1999, the Shell Group's revised guidelines resulted in an overstatement of

the Group's proved reserves of 940 million boe. For the period 1998 through 2001, the SEC

found that the change in guidelines caused the Shell Group to add more than 1.2 billion boe to

reported proved reserves. These new guidelines were contrary to the SEC definition of proved

reserves, which, as alleged herein, requires, among other things, data indicating there is a

"reasonable certainty" that oil or natural gas can be recovered through existing wells and

equipment, and/or a plan of development has been approved.

127.    Numerous former employees who had first-hand knowledge of these issues while

employed by the Companies have emphasized that the Companies made no effort to apprise

employees in the field of the SEC's requirements for classifying reserves as proved. CS 2 stated

that the Companies had internal rule books dictating how reserves were to be reported, but that

those books contained no mention of SEC guidelines. CS 3, who provided reserves data to The

Hague for various fields in Nigeria, stated that CS 3 never saw any material that described SEC

guidelines for reporting proved reserves. CS 4, whose responsibilities included not only

estimating reserves, but also training engineers about how to estimate reserves, stated that CS 4

had never seen the SEC guidelines until he/she read about them in newspaper accounts earlier this

year. Similarly, CS 5 stated that he/she never used SEC guidelines in calculating reserves, and

that few technical people at the Companies would have been aware of those guidelines.

128.    The former Shell executive interviewed by THE WALL STREET JOURNAL (as reported in

the article of March 18, 2004) also said that the Companies amended their guidelines again at the

end of 2001 to warn that gas from "major" projects should not be booked as reserves until

agreements had been signed concerning the Shell Group's commitment to invest money in the

46

project. However, even this amendment did not go far enough to comply with SEC and accounting rules. This was confirmed by the SEC in the complaint it filed in connection with the Cease and Desist Order (the "SEC Complaint"): "Before September 2003, with respect to frontier developments [, such as Gorgon,] Shell's guidelines required neither a currently existing market for a field's hydrocarbons nor a commitment by Shell to develop the field or the infrastructure necessary to bring the hydrocarbons to market." Only with the 2003 guideline revisions did the Companies require, for the first time, certainty of an existing market and a "Final Investment Decision" on significant projects before reserves associated with the project could be classified as proved.

129.     According to an internal report dated December 8, 2003 (a 42-page report to senior Group executives describing significant overstatement of the Companies' proved oil and gas reserves by 2.1 billion to 3.6 billion boe) (the "December 8th Report"), the original amendments "corrected the group's under-reporting of mature reserve fields relative to competitors, [b]ut with the benefit of hindsight it left the group vulnerable to net over-reporting of immature field reserves, brought about, for example, by registering reserves well in advance of the commitment to develop and including reserves outside the proven area as it would be defined by the S.E.C."

130.     Taking advantage of the changes, the Shell Group Defendants were able to reverse the trend of declining reserves – and more important, they were able to report that the Shell Group was replacing reserves far faster than it was producing them. According to a confidential internal review code-named Project Rockford (which led to the December 8th Report), the changes LEAP recommended allowed the Group to increase its oil and gas reserves not by discovering major new sources, but by changing its accounting to add reserves it was uncertain could ever be produced.

47

131.    Thus, as reported in THE LONDON TIMES on March 22, 2004, Watts, then the senior

executive in charge of the EP unit, was able to tell 600 Group executives at a conference in the

Dutch city of Maastricht in June 1998 of the success of a special management program that had

recently addressed a fundamental problem at the Companies – that the Companies were

producing oil and gas faster than they were finding new reserves.  At that time, Watts did not

disclose that the problem of declining reserves was resolved by relaxing the Companies' reserves

reporting guidelines in violation of SEC Rule 4-10.

### 3.    The SEC Increases Its Scrutiny of the Industry's Reserves Reporting

132.    By 1999, concerns were rising over a push by U.S. oil companies into overseas

projects and a boom in joint ventures, trends that made it more difficult to get a clear picture of

reserves.  Consequently, the SEC began to intensify its scrutiny of oil company reserves, in

particular with respect to the manner in which oil companies calculated reserves in deepwater

fields, such as in the Gulf of Mexico.  According to the Shell Group, less than 10% of the

reclassified reserves are related to the SEC's Gulf of Mexico review.  During a Fourth Quarter

2003 Reserves Presentation, the Companies admitted that they recategorized 100 million boe

from proven reserves relating to the Gulf of Mexico.

133.    According to a March 12, 2004 article published in THE WALL STREET JOURNAL, the

SEC hired two engineers dedicated to reviewing reserve estimates for oil and gas companies, Jim

Murphy and Ron Winfrey.  Murphy and Winfrey soon put the industry under greater scrutiny.  In

2000 and 2001, the SEC issued guidelines requiring companies to have investment commitments

and other supporting evidence to show why they believed their oil and gas fields would be

developed under prevailing financial, political, and technical factors.  For example, on March 31,

2001, the SEC issued the guidance on the application of Rule 4-10.  Specifically, the SEC:

- emphasized the conservatism underlying the definition of proved reserves;

- observed that "economic uncertainty such as the lack of a market (e.g. stranded hydrocarbons) . . . can also prevent reserves from being classified as proved";

- specifically advised that, in "developing frontier areas . . . issuers must demonstrate that there reasonable certainty that a market exists for the hydrocarbons and that an economic method of extracting, treating and transporting them to market exists or is feasible and is likely to exist in the near future . . . significant lack of progress on the development of such reserves may be evidence of a lack of commitment. Affirmation of this commitment may take the form of signed sales contracts for the products"; and

- with respect to hydrocarbon volumes whose production depends on the extension of government permits or licenses, indicated that automatic renewal of such permits or licenses "cannot be expected . . . unless there is a long and clear track record which supports the conclusion that such approval and renewals are a matter of course."

134.    The GAC Report notes that, as a general matter, "[b]eginning in 2001, recognition of the strictures of SEC rules, in place since 1978, increased within the Company, in part due to the publication on the SEC website of SEC guidance regarding the importance of investment commitments and other indicia of 'reasonable certainty,' with a growing recognition that the Company's reserve numbers were not in full compliance with these rules."

135.    In letters to oil companies in 2002, the SEC chastised companies for not obeying reserves rules, demanding explanations of how calculations were made.  In industry forums, SEC engineers cited as "red flags" reserve calculations in countries where the government had not approved the project.

136.    In 2002, as SEC officials were beginning to offer tougher interpretations of the accounting rules for reserves, executives at the Shell Group developed a Potential Reserves

Exposure Catalogue, which listed the major concerns of the current inventory. Modest reductions in the volume of booked reserves were made, but most booked reserves were retained. According to the December 8th Report, "The view was taken that the exposures should indeed be highlighted and addressed as a matter of priority, but that no corrective action was warranted in the meantime in relation to external disclosures." This course of action did not comport with SEC rules. Under Rule 4-10, when previously reported proved reserves no longer satisfy the requirements of the rule, they can no longer be included in proved reserves disclosures. The Group's guidelines did not require it to de-book the reserves that no longer qualified as proved under the SEC rules. Instead, as noted in the SEC Complaint, "the guidelines urged Shell personnel to 'exert caution' in de-booking reserves to 'minimize fluctuations [in proved reserves] over time.'"

137.    The December 8th Report also indicated that there were financial incentives for executives to overstate reserves: "Through the linkage of proven reserves additions to business and individual score cards, it is possible that situations occurred in which staff involved with reserves estimation were subjected to pressure to propose proved reserves changes that might not have been fully compliant." As reported in THE WALL STREET JOURNAL EUROPE on July 15, 2004, the Companies' Group Reserves Auditor ("GRA"), Anton Barendregt ("Barendregt") – the lone, part-time, former Shell employee who was responsible for auditing the Group's proved reserves worldwide – "prominently flagged" in two reports written in January 2002 and 2003 (both of which were sent to senior managers and the accounting defendants) that the Companies' "scorecard" bonus system encouraged the inflation of reserves bookings. In the January 2003 warning, Barendregt devoted a lengthy section to the scorecard bonus system. In that memorandum, Barendregt wrote that senior managers in the EP division rejected doing away with reserves-related bonuses. That decision did not sit well with Barendregt, who wrote, "it is the

50

auditor's firmly held belief that the reserves-addition targets in these score cards present a potential threat to the integrity of the Group's reserves estimates." As Colin Allcard, a former senior manager in Shell Transport's Ethiopian oil products division, was quoted as saying in a March 12, 2004 article in THE NEW YORK TIMES, "They set clearly defined targets, and created motivational schemes. Your performance was measured and rewarded."

## B.    Defendants' Knowledge of the Group's Overbookings

138.    On January 31, 2000, Group managers made a presentation that showed an RRR of 37% for the year ended December 31, 1999. As noted by the FSA, "This RRR figure was robustly rejected and on 11 April 2000 Shell announced an RRR for 1999 of 56%." According to the FSA, the presentation also highlighted concerns in Nigeria that a substantial portion of the SPDC's reported proved reserves (in excess of 600 million boe) were vulnerable as non-compliant with SEC rules – these reserves were "constrained by license expiry and depended on unrealistic production forecasts that appeared to have been 'reverse engineered' solely to support the reserve figures." (Emphasis added.) The presentation also cautioned that proved reserves could not be booked in Gorgon because of "limited market availability and already large uncommitted proved gas reserves." Significantly, the presentation noted that reported proved reserves in Gorgon had been a point of contention for the previous two years with external auditors.

139.    In June 2000, Shell Group planners made an internal presentation to senior managers (believed to be the "executive committee" of the EP unit, as reported by THE WALL STREET JOURNAL on April 1, 2004), warning that the Companies risked disappointing financial markets with overly optimistic assumptions about exploration and production projects around the world.

147.    Van de Vijver was not the only person within the Shell Group to warn of

overstated reserves. As reported in The WALL STREET JOURNAL EUROPE on July 15, 2004, Barendregt

warned, in a January 2002 memorandum marked "confidential," that a portion of 2001 mature

reserves (approximately 1,250 million boe) was at risk of being overstated. He also raised

questions about the integrity of Shell's overall reserves-reporting system. Barendregt further

warned that the Shell Group's guidelines for booking reserves were not in compliance with SEC

guidelines in all cases. Barendregt circulated this memorandum to senior Shell Group executives

(in the EP unit) and to KPMG NV and PwC UK. As noted in the article, "three people familiar

with the situation" confirmed that KPMG NV and PwC UK received the memorandum.

148.    The GAC Report reveals that senior executives repeatedly generated and circulated

reports among other senior Shell Group executives warning that the Companies' internal

guidelines for booking reserves were inconsistent with current SEC guidelines. In a Note for

Information summarizing the Shell Group's reserves position at December 31, 2001, which van

de Vijver forwarded to the CMD on February 11, 2002, van de Vijver warned that proved reserve

exposures were as high as 2.3 billion boe because of non-compliance with SEC guidelines:

**Exposures**

**Securities and Exchange Commission (SEC) Alignment**
Recently the SEC issued clarifications that make it apparent that the
Group guidelines for booking Proved Reserves are no longer fully
aligned with the SEC rules. This may expose some 1,000 mln boe of
legacy reserves bookings (*e.g.* Gorgon, Ormen Lange, Angola and
Waddenzee) where potential environmental, political or commercial
showstoppers exist.

**End of License**
In Oman PDO, Abu Dhabi and Nigeria SPDC (18% of EP's current
production) no further proved reserves can be booked since it is no
longer reasonably certain that the proved reserves will be produced
within license. The overall exposure should the OU business plans
not transpire is 1,300 mln boe. Work has begun to address this

54

important issue.

149.    According to the GAC Report, "[t]he Note raised issues of sufficient concern to [Watts] that he required . . . a further presentation be made to [the] CMD."

150.    On February 20, 2002, EP managers circulated the EP Business Appraisal for 2001, which was presented at a meeting held on February 25 and 26, 2002.  According to the FSA, "[b]oth the 'Main Issues' section and the main body of the Appraisal stated that the SEC's guidance made it clear that the approach advocated by Shell guidelines was, in many cases, too aggressive and would be likely to affect future bookings in new fields such as Nigeria and possibly existing bookings representing some 1,000 million boe."  The FSA also noted that the "Appraisal also referred to reserves which could no longer be booked because of license expiry issues and production limitations amounting to an additional 1,000 million boe."

151.    Notwithstanding the foregoing, on May 28, 2002, in an e-mail to van de Vijver, Watts directed van de Vijver to leave "no stone unturned" to achieve a 100% RRR for 2002, a result inconsistent with significant debooking:

> You will be bringing the issue to CMD shortly.  I do hope that this review will include consideration of all ways and means of achieving more than 100% in 2002 – to mix metaphors . . . considering the whole spectrum of possibilities and leaving no stone unturned.

152.    CS 5 stated that Watts put extremely high demands on the EP engineers to find more reserves.  "It was sent down the line as a directive."  According to CS 5, the targets Watts set were not technically realistic, but were financially attractive.

153.    Shortly thereafter, on July 22, 2002, a second presentation was made to the CMD in a Note for Discussion submitted by van de Vijver.  The Note identified oil and gas reserves that were "aggressive[ly]" booked, notably Gorgon and Nigeria.  The Note also observed that without

the gain would be seen purely as a paper exercise: many analysts have concluded that reserves replacement is the key challenge facing Shell over the next few years and they might react negatively to this one-off adjustment to the figures. Moreover, this difference in reporting practice . . . provides an offset to other elements of existing proved reserves inventory that could be viewed as being potentially at risk . . . . [T]he potential exposure that they represent is also of the order of 1,000 million boe.

168.    On November 9, 2003, after receiving what he considered an unfairly critical performance review from Watts, van de Vijver e-mailed Watts, complaining that he was "becoming sick and tired about lying about the extent of our reserves issues and the downward revisions that need to be done because of far too aggressive/optimistic bookings."

169.    On November 8, 2003, the day before van de Vijver sent his e-mail to Watts complaining that he was tired of lying about proved reserves, van de Vijver wrote an e-mail to a colleague about the Group's aggressive reserves bookings and the impact on the RRR and the price of the Companies' stock:

As you know 2003 RRR is the most important share price influencer also as expectations are high and they do not know that we are still paying for aggressive reserves bookings [including thos[e] that have not reached FID yet!!] in the past!

170.    Van de Vijver, who was aware RRR was a key performance indicator, had participated in stock analysts' presentations in which the issue of proved reserves and RRR were a focus.

171.    At the end of November 2003, a presentation was prepared for a meeting of the Conference, which was scheduled for December 3, 2003. According to the FSA, a draft of the presentation was distributed to some members of the Shell Group's senior staff. Regarding Oman and Nigeria, the draft presentation stated: "the total volume not in compliance with SEC guidelines in the proved reserves filing in the 20-F as per 31/12/02 has become significant (2.1 bln boe or 11% of the Group's total proved reserves)."

61

178.    To disguise the improper booking, the Companies recorded the reserves not as "new discoveries," which garner more attention from auditors and investors and could have been challenged more easily internally, but instead as "revisions." The "revisions" category, however, is intended for subsequent adjustments to previously reported reserves, due either to a better understanding of the field or to new technology. It is not intended for reserves that have never before been recorded as proved. According to an analyst with Lehman Brothers, listing Gorgon as a revision "is why it is not really visible to outsiders." Publicly, van de Vijver later portrayed the misclassification as a mistake and an "embarrassment," claiming it was the result of a miscommunication with Shell Australia.

179.    Although the Companies now acknowledge that these reserves should not have been recorded as proved at all, whether as revisions or new discoveries, they have also contended that the booking was based upon letters of intent for gas sales and internal-development timetables that ultimately failed. This point was confirmed by the SEC in the Cease and Desist Order: "At that time, Shell did not have a contract to sell Gorgon gas, had no firm development plan and had not made a Final Investment Decision." According to the GAC, the Companies' guidelines at the time allowed proved reserves based on an "expectation of availability of markets," and, for a brief period, commercial expectations for Gorgon arguably met this loose requirement. Analysts, however, have rejected this explanation. Said one analyst quoted in the LONDON TIMES on January 10, 2004, "[e]veryone has letters of intent; it just means they are willing to discuss terms."

180.    Moreover, as the GAC Report concedes, "From its inception, the Gorgon 'proved' reserves did not meet the overriding SEC standard of 'reasonable certainty.'" As described below, the history of the Gorgon fields bears this out: the Gorgon reserves unambiguously failed

to meet the SEC's "reasonable certainty" standard for proved reserves when they were booked (despite the purported existence of letters of intent). Indeed, they fail to meet that standard even today, more than six years later. To date, neither of the Companies' joint venturers in developing the Gorgon fields, ChevronTexaco and ExxonMobil, has booked a single cubic foot of Gorgon natural gas as proved – even though ChevronTexaco has already lined up certain customers. Reportedly, ChevronTexaco executives are angry with the Companies for declaring Gorgon gas "commercial" ahead of its partners.

181.    According to the website of the Gorgon Venture (defined below) (http://www.gorgon.com.au), the Gorgon area contains certified gas reserves of 12.9 trillion cubic feet, and includes five separate fields:  West Tryal Rocks, discovered in 1973; Spar, discovered in 1976; Gorgon, discovered in 1980; Chrysaor, discovered in 1994; and Dionysus, discovered in 1996.  Gorgon is the largest, with 12 trillion cubic feet of gas.  A broader area, known as the Greater Gorgon reserves, currently represents over 40 trillion cubic feet of gas.

182.    Of the three companies participating in the unincorporated joint venture to develop the Gorgon fields (the "Gorgon Venture" or the "Venture"), ChevronTexaco has the largest stake, at 57.1%, and is the operator of the Gorgon fields.  The Companies have the next largest interest, at 28.6%, and ExxonMobil has a 14.3% interest.

183.    Over a twenty-year period beginning in the early 1980s, the three participants in the Venture spent more than $800 million on exploration, development, and marketing to prepare the Gorgon area for eventual development.  In the late 1990s, they determined that the gas processing facility needed for the success of the Venture could not economically and competitively be placed on the Australian mainland, but would have to be built on Barrow Island, a Class A Nature Reserve located some 40 miles east of the Gorgon fields.  Thus began a



193.    Under these circumstances, the booking of approximately 557 million boe of proved gas reserves relating to the Gorgon fields, as of December 31, 1997, was improper and in violation of Rule 4-10, as Defendants were well aware (according to both the SEC, the FSA, and the GAC Report).

194.    Indeed, the Companies revisited the questionable status of the Gorgon booking at several points, beginning in 1999.  The GAC Report cites, for example, the January 17, 2000 decision – reviewed in a presentation to the EP Executive Committee attended by Watts – to "freeze" the booking, despite a 20% increase in technical reserves, as an initial instance where the Group reviewed the booking of reserves at Gorgon.  As noted by the FSA, the January 17, 2000 presentation explained that a freeze in booking was appropriate because of "'the limited market availability and already large uncommitted proved gas reserves.'"  It further warned that "proved

70

gas volumes in Australia have been a point of challenge by the external auditors . . . for the last two years and incremental booking at present would be hard to support." (Emphasis added.) In October 2000, the GRA affirmed this "freeze" status, against a local technical opinion in favor of de-booking. In 2002, the GRC concluded that the Companies should maintain Gorgon as proved reserves unless it was "absolutely clear that development will not proceed in a reasonable time frame." While de-booking continued to be debated, no action was taken until January, 2004. Indeed, between 1999 and January 9, 2004, according to the SEC, the Group "reevaluated whether to maintain Gorgon's 'proved' status." Significantly, as noted by the SEC, "[d]uring this time, Shell learned that none of its partners in Gorgon had booked proved reserves in the field."

195.    By no later than 2002, as the SEC found, "Shell's EP personnel recognized that Gorgon was a 'dodgy' booking whose status as proved reserves was not supportable even under Shell's lenient 2002 internal reserves guidelines." Consequently, the Companies attempted to manage the Gorgon reserves as a means of de-booking the reserves as proved: "In March 2000, Shell's Australian affiliate was instructed by regional Shell management to review options for gradually de-booking Gorgon proved reserves, such as by offsetting Gorgon de-bookings against then-anticipated new proved reserves bookings in Shell's Sunrise natural gas field in the Timor Sea." But, as set forth in the GAC Report: "In the words of the current Group Reserves Coordinator [John Pay], Gorgon had long 'stuck out like a sore thumb', but, at over 500 million boe, de-booking of the reserve was 'too big to swallow.'" To date, as noted in the SEC Complaint, "[n]o gas from Gorgon has ever been sold or firmly contracted for [sale], and Shell has yet to make a final investment decision to develop Gorgon's hydrocarbons."

stream in 2003. The Bonga field is estimated to contain 600 million boe. Analysts expected that Nigeria would deliver 33% of the Shell Group's production increases through 2007.

206.    Although the Bonga project was set to come on stream in 2003, extraction and production of the field was beset with problems (e.g., issues with the construction of the Bonga FPSO (such as leaks in the hull) and its installation in Nigeria (the Bonga FSPO left Newcastle, England on October 19, 2003, for Nigeria (with no propulsion system of its own, the vessel had to be towed)), infrastructure issues, compliance with government mandates, lack of adequate government funding, and ethnic unrest) that made proved reserves classification improper and in violation of SEC guidelines. As shown in the Cease and Desist Order, the Notice to Take Action, the GAC Report, and the news media, the Group Defendants knew of these problems, and knew that the booking of reserves was unreasonable and improper.

207.    By 1999, the SPDC had booked proved reserves based upon the Shell Group's 1998 revised guidelines and forecasts that, as the SEC noted, "gave the appearance that the proved portion of the reserves could be produced within the remaining license period." Their forecasts were predicated on myriad assumptions, rather than existing conditions as required by SEC rules, concerning Nigeria's economic stability and increased production quotas from the Nigerian government and OPEC. As the SEC found, however, "none of these assumptions was reasonable, particularly in light of the fact that SPDC's operations performed well below the projected levels throughout the period."

208.    EP management was advised in the January 17, 2000 presentation that a substantial part of SPDC's reported proved reserves (in excess of 600 million boe) was constrained by license expiration and depended on unrealistic production forecasts that appeared to have been "reverse engineered" solely to support the reserve figures. The presentation also concluded that

the Group's 1999 RRR was 37%. According to the SEC and FSA, however, "EP management forcefully rejected this conclusion and instead caused Shell to report a 56% RRR for that year."

209.    The GAC Report also spoke of the January 17, 2000 presentation. According to the GAC Report, no later than early 2000, EP management was aware that a substantial amount of proved reserves booked by SPDC "could not be produced as originally projected or within its current license periods." Incredibly, management decided, "[r]ather than de-book reserves, an effort was undertaken to manage the problem through a moratorium on new oil and gas additions, in the hope that SPDC's production levels would increase dramatically to support its reported reserves."

210.    The following month, the GRA submitted his report on the Group's 1999 proved reserves, wherein he repeated the foregoing concerns, noting that SPDC faced license expiration problems and could support its proved reserves figures only through "significant aspirational upturns in future offtake levels in order to justify their proved reserves levels." The SEC found that the GRA "repeated these concerns, without EP taking any steps to de-book non-compliant reserves. . . ."

211.    By early 2002, according to the SEC, "other Shell reserves personnel, including the Group Reserves Coordinator, had raised concerns within EP that SPDC's reported proved reserves could not be produced within existing license constraints."

212.    Thereafter, according to the SEC, "EP management continued to review the technical and commercial maturity of SPDC's reserves. After completing the initial phase of its work in September 2003, the EP review team concluded that there was an approximately 750 million boe 'gap' between the reported proved reserves and those supported by projects in the business plans." Also in September 2003, the GRA reported the results of his just-completed

audit of SPDC's proved reserves, concluding that "there can be no doubt that the portfolio of proved oil reserves per [January 1, 2003] has been overstated due to insufficient maturity in the underlying future projects." As noted by the SEC, the GRA indicated that "the 'precise' amount of de-booking required was dependent on additional reviews already underway by EP."

213.    By November 2003, the EP review team completed the second phase of its work. As noted by the SEC, "[i]t confirmed the earlier findings of a 750 million boe 'gap' and added another 800 million boe of proved reserves that were not sufficiently mature under Shell guidelines."

214.    Management also decided that it would conceal the reserves problem from the investing public. As noted in the news media, the December 8th Report recommended that "any debooking of proved reserves" in Nigeria should "not be identified publicly with Nigeria," but classified under a wider geographic area. Accordingly, in February 2004, the Shell Group reported reserve information about Nigeria in the context of its African operations, which it said accounted for 1.5 billion barrels of the revision. The Shell Group has operations in several African countries, including Libya and Egypt, but, as reported in THE NEW YORK TIMES on March 19, 2004, Nigeria is the only country listed in a "potential reserves exposure catalog" that was distributed to senior executives late last year.

### a.    **Poor Infrastructure Slowed Recovery**

215.    Oil fields require a large infrastructure to produce, process, and transport the hydrocarbons to market. As the Shell Group brought new oil wells on line, each required capital expenditures and commitments to infrastructure to process and transport the oil and liquid natural gas. As alleged above, by no later than 2000, EP management knew that the SPDC had been

encountering infrastructure and transportation problems that made the booking of proved reserves improper.

216.    Beginning in 1997, the Nigerian government mandated that natural gas flaring end by 2008 and that these resources be captured.  Flaring is a means of disposing of waste hydrocarbon gases by burning them.  With an elevated flare, the combustion is carried out through the top of a pipe or stack where the burner and igniter are located.  Flaring adversely affects the environment by, among other things, releasing sulphur oxides into the atmosphere, when the gas contains sulphur.

217.    The Companies stated that they were committed to meeting the 2008 target to cease flaring and planned to recapture the gas for sale.  The Shell Group's website stated that "this opportunity [to gather gas] is going well."  The Companies stated that they planned to integrate oil and gas production, that they had three production processing trains fully operational, and that they were building additional trains to meet the deadline.

218.    The end of flaring required new investments in infrastructure of older oil production facilities to meet Nigeria's mandate.  However, according to THE NEW YORK TIMES on March 19, 2004, many oil field projects did not include plans to gather natural gas, and oil production would have to be stopped unless the Companies found a way to use the gas.  Van de Vijver conceded as much in a February 5, 2004 conference with market analysts: "it is clear that the growth production onshore in Nigeria is less than what we and what the government had hoped five/ten years ago, and it's all linked with the complexity of putting the integrated oil and gas development together, building the gas infrastructure and not only to collect and compress the gas, but also to transport it over the vast onshore delta and also ultimately bringing to Nigeria and the LNG."

219.    The GAC Report observed that in Nigeria, there was "a significant decrease in the reserve 'offset' supposedly available due to 'fuel and flare.'"

### b.    Lack of Governmental Financing Slowed Recovery

220.    A major problem facing Nigeria's upstream oil sector has been insufficient government funding of its joint venture commitments.  As reported in THE NEW YORK TIMES on March 19, 2004, in November 2003, the International Energy Agency (the "IEA") found that joint ventures – like the Shell Group's in Nigeria, where it is in partnership with the government – "suffered from underinvestment, because of a lack of state funding."  Under the joint venture arrangements, the Nigerian government and its partners contribute to these projects according to their equity holding.  According to the IEA and to local news media reports, government budget and other developments had shifted more of the financial burden of developing oilfields to foreign investors.

221.    The 2002 SPDC Annual Report is illustrative of the funding problems that faced the SPDC.  The report stated that "2002 was a challenging year.  The Federal Government allocated a budget of $3.2 billion to the oil industry to fund the Nigeria National Petroleum Company's (NNPC's) interest in joint ventures.  This was lower than the 2001 budget and well below the level requested by the industry."

222.    The report also stated that "[t]he budget constraint led to a major reduction in investments to increase oil production capacity, improve infrastructure and increase reserves.  Also, we experienced serious difficulty in paying our contractors and suppliers, and we incurred delays in settling outstanding invoices to third parties."  Nevertheless, the SPDC booked a portion of the reserves as proved.

### c.    Political Unrest and Delay Slowed Recovery

223.    In addition to financial issues, political and ethnic strife in the Niger Delta region, including violence, kidnapping, sabotage, and the seizure of oil facilities, contributed to the Companies' inability to manage reserves.  As reported in the December 8th Report, "Community disturbances and political instability" were also to blame.  Much of Nigeria's oil reserves are located in the delta region in the south, where unrest forced the Companies to reduce production.

224.    In early March 2003, for example, the Shell Group removed its non-essential staff and later shut down its operations in the Niger Delta region, evacuating all personnel, on March 19, 2003.  The Companies closed their flow stations, which had a combined capacity of 126,000 bbl/d.  The Group later evacuated four oil facilities – oil pipeline pumping stations at Ogbotobo, Opukushi, Tumo, and Benisede – on March 24, 2003, raising the number of closed Group facilities to 14.  These actions shut-in 320,000 bbl/d, or nearly one-third of the Shell Group's Nigerian output.

### d.    The Need To Protect OPEC Interests

225.    Internal documents show that the Shell Group concluded that more than 1.5 billion barrels, or 60% of its Nigerian reserves, did not meet SEC standards for proved reserves.  The scale of the revision is important because Nigeria is seeking to increase its production quota within OPEC.  As CS 4 has explained, the size of proved reserves is a basic consideration when OPEC sets quotas for its members.  At stake for Nigeria are billions of dollars in revenue annually.

226.    According to the December 8th Report, identifying the extent of the Shell Group's lowered reserves in Nigeria could affect Nigeria's "quota discussions" with OPEC.  Nigeria had

been seeking a quota increase as part of a plan to double its daily production in the next several years.

227.    As reported by the news media, the reserves reclassification also relates to OPEC restraints. THE TIMES [LONDON] reported on January 10, 2004, that the Shell Group was unable to comply with Nigeria's OPEC quota. Consequently, the "[C]ompany should not have booked reserves of oil that Nigeria was unable to export."

228.    Shell Group executives were acutely aware of the potentially explosive political effect of their cutting their estimates of Nigerian reserves. In the December 8th Report, which was prepared for senior executives, such as van de Vijver, the authors recommended that the revised Nigerian reserves remain "confidential in view of host country sensitivities."

229.    Internal documents show that in April 2001, the Group submitted papers to Nigerian authorities, forecasting production increases of as much as 70% by 2003. Another set of documents prepared between 2001 and 2003 showed increases in reserves booked with the government based largely on data reviews, rather than new wells. (See FINANCIAL TIMES, April 15, 2004.) Data reviews, however, do not generally suffice to satisfy the SEC's requirements for classifying a reserve as proved.

230.    According to Jonathan Bearman, managing director of Clearwater, a consulting firm that does business intelligence work in Nigeria, "Concerns had been growing among Nigerian oil officials for some time. There were quite big claims made about total reserves and Shell accounted for a large part of that."

231.    Bearman also said that concerns were raised in mid-2003 after the Nigerian government's annual independent audit of its partnerships with the Shell Group and other oil producers. Issues raised included the Group's aggressive production growth estimates and the

number of reserves the Companies were booking with the government, going back as far as five years.

232.    At the end of 2002, the Shell Group recorded 2.524 billion barrels of proved reserves in Nigeria, but as the December 8th Report found, only 990 million barrels "fully complie[d]" with SEC guidelines. Internal documents show that senior managers were told in December 2002 that 720 million barrels in Nigeria were "noncompliant" with guidelines established by the SEC, and that a further 814 million barrels were "potentially noncompliant."

###    e.    Nigeria's Reserve Addition Bonus

233.    The December 8th Report stated that the publication of too much information concerning the lack of reserves could jeopardize the Companies' negotiations with Nigeria over $385 million in bonus payments.

234.    From 1991 to 1999, Nigeria offered the Companies and other foreign oil companies an incentive to increase reserves, called a Reserves Addition Bonus ("RAB"). As noted by THE LONDON TIMES on March 21, 2004, "The Nigerian government offered oil companies tax breaks from 1991 to 1999 for oil-reserve additions – or any oil reserves added over and above what they expected to find."

235.    According to the December 8th Report, the Group claimed that it was owed $385 million under the bonus program, but had only sought 30% to 50% of the claim.

236.    According to the December 8th Report, van de Vijver said that while in principle a debooking of S.E.C. proved reserves should not impact on RAB, a debooking would "likely . . . undermine the current resolution process, or would jeopardize relations if a settlement were agreed just ahead of a de-booking," adding that this would put $115 million to $170 million "at risk."

### b.    Shell Management Increased Oman's Reported Reserves

271.    By the end of 2000, despite the production decline in Oman, the Group and PDO determined to increase PDO's proved reserves estimates. Based on the 1998 revisions to the their guidelines, the Companies revised PDO's proved reserves upward "by assuming that, for fields of certain maturity, both proved developed and proved undeveloped reserves would be increased to equal the expectation developed and undeveloped volumes." The increase added 251 million boe to the Shell Group's reported proved reserves at December 31, 2000. Internal Group documents show that the figure for proved oil reserves in Oman was improperly increased in 2000, resulting in a 40% overstatement.

272.    In mid-2001, PDO began to experience a steep decline in production. Within a few months, the situation had grown sufficiently worse, causing PDO to withdraw its long-term business plan for 2002. As noted by the SEC in the Cease and Desist Order, "[t]he production decline also prompted the Omani government to question the volume of expectation reserves PDO was carrying, as a result of which Shell agreed to a $30 million 'down payment' to the Omani government on what was expected to be an eventual refund of expectation reserve booking fees it previously had received." By the end of 2001, as production continued to decline, PDO operated without a reliable or realistic long-term business plan on which to base its proved reserves reporting. According to the SEC, "[w]ith Shell's encouragement, PDO instead adopted an 'aspirational' production forecast to support its reported proved reserves figures."

273.    As explained in the Cease and Desist Order, during 2002, the Companies were advised that PDO's proved reserves figures "depended upon sustaining current production rates, without any declines, throughout the remaining lifetime of the production license, which was to expire in 2012." As noted by the SEC, "[i]n view of the production declines already being

experienced, this was not realistic. Shell nevertheless continued to report its share of PDO's reserves as proved at year-end 2002."

274.    These events were confirmed in the GAC Report. According to the GAC Report, the reserve overstatement stemmed from insufficient technical work that was done to support the increase in reserves. When serious production declines were suffered thereafter, these increased reserves were maintained based upon aspirational production targets. The GAC concluded in its report that various members of EP management, including Defendant van de Vijver, were aware of the matter when the production problems increased, and the Companies agreed to make the $30 million down payment (in the form of a deduction against its 2001 net reward) in partial payment for an inchoate debooking of expected reserves.

275.    The Shell Group's interest in increasing shareholder value in the short-term played a part in the overvaluation of the reserves: because its license in Oman expires in 2012, it emphasized producing more oil sooner. Indeed, the December 8th Report stated that "the extreme focus on short-term development opportunities ('keep the rigs busy to keep the oil rate up') to the detriment of defining long-term projects" also drained Oman's reserve pool.

276.    In the December 8th Report, the Shell Group recommended that the lowered amount of Oman's proven reserves be kept confidential because of the nexus between reserves and bonus compensation. As reported by THE NEW YORK TIMES on April 8, 2004, "according to the report, [proven reserve figures] involve[ ] negotiations over bonuses that the company can win for increasing reserves. The basis for the bonus is a less rigorous standard – called expectation reserves – than the proven-reserves yardstick that the Company is required by the SEC to list in periodic filings." The December 8th Report said that "the expectation reserves may be overstated."

277.    The December 8th Report also said, "With hindsight, it might have been more appropriate to correct the expectation estimate down rather than the proved estimate upwards." The report said that it was understood at the time when the reserve estimate was increased that a more detailed assessment would follow. But it was not until 2003, four years after the previous audit, that the Shell Group did an audit of proved reserves of its operations in Oman. As a result, "[p]roved total reserves are currently overstated by some 40 percent."

278.    As alleged herein, the Shell Group reclassified 2.3 billion boe due to "project maturity in existing producing areas," such as Nigeria and Oman. In Oman, 393 million boe of proved reserves associated with PDO had to be de-booked as noncompliant with SEC rules. The SEC found that "[o]f this amount, 144 million boe were non-compliant because they were 'associated with projects . . . not sufficiently mature to qualify as proved undeveloped reserves.' The remaining 249 million boe were non-compliant because they were not supported by any identified projects."

**4.    Norway (Ormen Lange)**

279.    The Ormen Lange field, named after a large Viking ship celebrated in Norse sagas, is located in the Norwegian Sea, approximately 140km west of Kristiansund, Norway. The field is the second-largest gas discovery on the Norwegian continental shelf. The discovery well was drilled in 1997. The field contains estimated resources of 315 billion cubic meters ("$m^3$") of natural gas. The main gas reserves lie in a reservoir in the Egga interval.

280.    Licenses for the development and production of the field are held by the following project partners:

-    Norske Shell ("Shell Norway"): 16% (production operator)

-    Norske Hydro Produksjon ("Norske Hydro"): 14.78% (drilling operator)

91

Petroleum and Energy on December 4, 2003, together with the Plan for Installation and Operation for the new subsea gas export pipeline, named Langeled, to the United Kingdom. The Norwegian government did not approve the submissions until April 2, 2004. As shown in the above timetable, production start-up is now projected to commence in the fall of 2007.

291.    Unlike its project partners, the Companies began booking reserves from the Ormen Lange field years before they and their partners could work out the difficult technical and marketing hurdles on the project. Indeed, in 1999, just two years after the field was discovered, the Companies started booking gas reserves even before an appraisal well was drilled or a feasibility study conducted, let alone the safety study discussed above:



292.    According to Thor Tangen, senior vice president with Norske Hydro and the project's director until January 2004, when the Shell Group booked the Ormen Lange reserves in 1999, the project partners had drilled just two exploration wells and done some preliminary feasibility studies. The Shell Group relied on three dimensional ("3D") seismic data to book reserves before additional delineation wells were drilled, which is not sufficient to satisfy SEC guidelines. As reported in the May 20, 2004 edition of ACCOUNTANCY, "Shell flow-tested two wells then used 3D seismic technology to say it had proved reserves between the two, rather than drill an additional well that could quite easily have cost $20 [million]."

293.    Of the Ormen Lange partners, only the Shell Group booked reserves as proved. Norske Hydro, Statoil ASA, BP, and ExxonMobil all held off booking reserves from Ormen

written or organized to offer useful guidance to reservoir engineers in the OUs." As discussed herein, the findings of the SEC and the FSA are in accord.

303.    Regarding the compliance role of the finance function, the GAC Report found that that function was not effective with respect to the subject bookings.

304.    Boynton attended CMD meetings beginning in 2001 and became a member of the CMD in 2003. Her responsibilities were different from other members of the CMD; she had direct responsibility to ensure that the Companies' financial disclosures to the market and to regulators were correct. Boynton took virtually no action, before the initiation of the investigation that led to the January 9th disclosure, to inquire independently into the underlying facts relating to the improper reserves bookings. Rather, Boynton relied upon the checks and balances of the Companies' representation and assurance process and the work of its independent external auditors to ensure compliance. As the memoranda prepared by Barendregt (the GRA) reveals, that process did not function properly.

**E.    Regulatory Actions**

305.    As alleged herein, various regulatory bodies have been investigating the events surrounding the reserves reclassification.

306.    On August 24, 2004, the SEC issued its Cease and Desist Order, in which it concluded as follows:

a.    The Companies violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. The Companies knowingly or recklessly reported proved reserves that were non-compliant with Rule 4-10, and failed (i) to ensure that the Companies' internal proved reserves estimation and reporting guidelines complied with Rule 4-10, and (ii) to take timely and

appropriate action to ensure that their reported proved reserves were not overstated in their filings with the SEC and other public statements.

    b.    The Companies violated Section 13(a) of the Exchange Act and Rules 13a-1 and 12b-20 thereunder. The Companies' failures to ensure that they estimated and reported proved reserves accurately in compliance with Rule 4-10 caused them to file annual reports on Form 20-F for the years 1997 through 2002 that were materially inaccurate, in that they overstated the Companies' reported proved reserves and accompanying supplemental information, including the standardized measure of future cash flows.

    c.    The Companies violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. The Companies failed to create and maintain accurate estimates of their proved reserves in compliance with Rule 4-10, and failed to ensure that they implemented and maintained adequate controls with respect to their reserves processes, sufficient to provide assurance that the reserves were estimated and reported accurately in accordance with Rule 4-10.

    307.    The Cease and Desist Order also states that the Companies have undertaken to spend $5 million in the development and implementation of a comprehensive internal compliance program.

    308.    In a separate civil action filed simultaneously with the proceeding that was the subject of the Cease and Desist Order, Royal Dutch and Shell Transport consented to the entry of a judgment by the U.S. District Court for the Southern District of Texas, Houston Division, pursuant to Section 21(d) of the Exchange Act, ordering Royal Dutch and Shell Transport, together, to pay $1 disgorgement and a $120 million civil penalty. *SEC v. Royal Dutch Petroleum Co. and The "Shell" Transport and Trading Company, p.l.c.*, No. H-04-3359 (S.D. Tex. Aug. 24, 2004).

309.    Also on August 24, 2004, the FSA issued its Final Notice to Shell Transport and

Royal Dutch to Take Action, in which the FSA imposed a penalty of £17 million for "market

abuse" and breaches of the FSA's Listing Rules.  The FSA stated that it considered the

Companies' misconduct to have been "particularly serious," requiring a "substantial financial

penalty," because:

> •    Shell announced false or misleading proved reserves and reserves
> replacement ratios to the market throughout the period 1998 to 2003
> inclusive;
>
> •    The false or misleading reserves information was not corrected
> until a series of announcements between 9 January and 24 May 2004 in
> which Shell announced the recategorisation of 4,470 million barrels of oil
> equivalent, being approximately 25% of Shell's proved reserves;
>
> •    Shell's false or misleading announcements of proved reserves were
> made despite indications and warnings from 2000 to 2003 that its proved
> reserves as announced to the market were false or misleading;
>
> •    Shell failed to put in place or maintain adequate systems or
> controls over its reserves estimation and reporting processes; and
>
> •    Following the first announcement of its recategorisation of proved
> reserves on 9 January 2004, STT's share price fell from 401p to 371p
> (7.5%) reducing STT's market capitalization on that day by approximately
> £2.9 billion.  On 9 January 2004 trading in the shares of STT accounted
> for more than 10% of the total volume of shares traded on the FTSE 100,
> of which STT was the seventh largest constituent by market capitalization.

## FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### Statements Made in Second-Quarter 1999

310.    On April 8, 1999, the Companies issued a press release entitled "Royal Dutch

Petroleum Company and the 'Shell' Transport and Trading Company, p.l.c."  According to the

press release, the Exploration and Production Executive Committee, led by Watts, planned to

present and discuss EP's plans and strategies before an audience of fund managers and analysts

| Group share of Associated Companies: | | | |
|---|---|---|---|
| As previously reported as at 31 December | 3,888 | 7,070 | - |
| Effect of reserves restatement as published in Annual Report | (1,005) | (1,308) | - |
| **As at 31 December** | **2,883*** | **5,762*** | **5,828** |

\*As restated

496.    On May 28, 2004, the Group issued its financial results for the year 2003. As the OBSERVER noted on May 30, 2004, "[i]n the report Shell admits to inadequate controls, lack of resources and unclear lines of responsibility that allowed the scandal to happen."

497.    As discussed at paragraphs 306-07 above, on August 24, 2004, the SEC issued its Cease and Desist Order, concluding that the Companies had, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, knowingly or recklessly reported proved reserves that were non-compliant with Rule 4-10 of Regulation S-X of the Exchange Act, and failed (i) to ensure that the Companies' internal proved reserves estimation and reporting guidelines complied with Rule 4-10, and (ii) to take timely and appropriate action to ensure that their reported proved reserves were not overstated in their filings with the SEC and other public statements. The SEC also concluded that the Companies had violated Section 13(a) of the Exchange Act and Rules 13a-1 and 12b-20 thereunder, and Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

498.    In a separate civil action filed simultaneously with the proceeding that was the subject of the Cease and Desist Order, Royal Dutch and Shell Transport consented to the entry of a judgment by the U.S. District Court for the Southern District of Texas, Houston Division, pursuant to Section 21(d) of the Exchange Act, ordering Royal Dutch and Shell Transport, together, to pay $1 disgorgement and a $120 million civil penalty. *SEC v. Royal Dutch Petroleum*

188

*Co. and The "Shell" Transport and Trading Company, p.l.c.*, No. H-04-3359 (S.D. Tex. Aug. 24, 2004).

499.    Also on August 24, 2004, the FSA issued its Final Notice to Shell Transport and Royal Dutch (the "FSA Final Notice"), in which the FSA imposed a penalty of £17 million for "market abuse" and breaches of the FSA's Listing Rules.

## LOSS CAUSATION/ECONOMIC LOSS

500.    The market for the Companies' securities was open, well-developed, and efficient at all relevant times. Accordingly, Lead Plaintiff and the Class purchased or otherwise acquired the Companies' securities at prices that were inflated due to the alleged misrepresentations, and suffered losses when the truth was made known and the price of the Companies' securities returned to its true value.

501.    As alleged herein, throughout the Class Period, the Group Defendants issued materially false and misleading statements concerning the Companies' reported proved oil and natural gas reserves. Specifically, the Companies publicly overstated: their proved oil and natural gas reserves by billions of barrels of oil equivalent; their reserves replacement ratios; and their future cash flows by over $100 billion. These materially false and misleading statements caused and maintained the artificial inflation in Companies' stock price throughout the Class Period, until the truth was revealed to the market.

502.    On January 9, 2004, the Shell Group partially revealed the truth about its reported reserves, stating that it would reduce its reported reserves holdings by 20%. This "proved reserve recategorisation" contemplated the reclassification of 3.9 billion barrels of oil and gas (2.7 billion barrels of oil and 1.2 billion boe of gas), one-fifth of the Companies' proved reserves. After removal of the almost four billion boe of hydrocarbons, the Shell Group's reserve life – measured