# EXHIBIT 14

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 50233 / August 24, 2004

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 2085 / August 24, 2004

ADMINISTRATIVE PROCEEDING
File No. 3-11595

| | |
|---|---|
| In the Matter of<br><br>Royal Dutch Petroleum Company and The "Shell" Transport and Trading Co., p.l.c.<br><br>Respondents | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Royal Dutch Petroleum Company ("Royal Dutch") and The "Shell" Transport and Trading Company, p.l.c. ("Shell Transport") (collectively with Royal Dutch, "Respondents").

II.

In anticipation of the institution of these proceedings, Respondents have submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, Respondents consent to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Cease-and-Desist Order, as set forth below.[1]

---

[1] In a separate civil action filed simultaneously with this proceeding, Royal Dutch and Shell Transport consented to the entry of a judgment by the U.S. District Court for the Southern District of Texas, Houston Division, pursuant to Section 21(d) of the Securities Exchange Act of 1934 ordering Royal Dutch and Shell Transport, collectively, to pay $1 disgorgement and a $120 million civil penalty. *SEC v. Royal Dutch Petroleum Company and The "Shell" Transport and Trading Company, p.l.c.*, H-04-3359 (S.D. Tex.) (August 24, 2004).

## III.
## FACTS

On the basis of this Order and the Respondents' Offer, the Commission finds that:[2]

### A. Respondents

#### 1. Royal Dutch Petroleum Company

Royal Dutch is a corporation incorporated under the laws of the Netherlands and headquartered in The Hague, Netherlands. Its stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange.

#### 2. The "Shell" Transport and Trading Company, p.l.c.

Shell Transport is a corporation incorporated under the laws of England and headquartered in London, England. Its Ordinary shares, as well as New York Shares representing Ordinary shares of an aggregate nominal amount of £1.50 and evidenced by Depositary Receipts ("New York Shares"), are registered with the Commission pursuant to Section 12(b) of the Exchange Act. Its New York Shares trade on the New York Stock Exchange.

#### 3. The Royal Dutch/Shell Group of Companies

Royal Dutch and Shell Transport do not engage in operational activities. They derive the whole of their respective incomes – except interest income on cash balances or short-term investments – from their interests in the collection of companies known as the Royal Dutch/Shell Group of Companies (the "Group" and, collectively with Royal Dutch and Shell Transport, "Shell"). The Group is organized under two Group holding companies that, directly or indirectly, own all of the Group companies. The parent companies, Royal Dutch and Shell Transport, own all of the shares of the two holding companies. Royal Dutch and Shell Transport are entitled to have their respective nominees elected as the members of the boards of directors of the holding companies. The managing directors of the holding companies are, in turn, appointed to a joint Committee of Managing Directors ("CMD") responsible for considering and developing objectives and long-term plans of the Group.

### B. Summary

In a series of announcements between January 9 and May 24, 2004, Shell announced the recategorization of 4.47 billion barrels of oil equivalent ("boe"), or approximately 23%, of the "proved" reserves it reported as of year-end 2002, because they did not comply with the

---

[2] The findings herein are made pursuant to Respondents' Offer and are not binding on any other person or entity in this or any other proceeding.

2

definition of "proved" reserves in Rule 4-10 of Regulation S-X ("Rule 4-10").[3] This recategorization reduced the standardized measure of future cash flows reported in Shell's original 2002 Form 20-F as Supplemental Information under Statement of Financial Accounting Standard No. 69 ("FAS 69") by approximately $6.6 billion. On July 2, 2004, Shell filed an amended 2002 Form 20-F reflecting the restatement of its proved reserves and standardized measure of future cash flows for the years 1999 to 2002 as follows:

| Year | Reduction in "Proved" Reserves | % Reduction | Reduction in Standardized Measure | % Reduction |
|---|---|---|---|---|
| 1997 | 3.13 boe | 16% | N/A[4] | N/A |
| 1998 | 3.78 boe | 18% | N/A | N/A |
| 1999 | 4.58 boe | 23% | $7.0 billion | 11% |
| 2000 | 4.84 boe | 25% | $7.2 billion | 10% |
| 2001 | 4.53 boe | 24% | $6.5 billion | 13% |
| 2002 | 4.47 boe | 23% | $6.6 billion | 9% |

As a result of the overstatement of proved reserves for 2002 and prior years, Shell also announced a reduction in its Reserves Replacement Ratio ("RRR") for the five-year period, 1998 through 2002, from the previously reported 100% to approximately 80%. Had Shell reported proved reserves properly, its annual and three-year RRR over this span would have been as follows:

| Year | 1-Year RRR | | 3-Year RRR | |
|---|---|---|---|---|
| | Original | Restated | Original | Restated |
| 1998 | 182% | 134% | n/a | n/a |
| 1999 | 56% | -5% | n/a | n/a |
| 2000 | 69% | 50% | 102% | 60% |
| 2001 | 74% | 97% | 66% | 48% |
| 2002 | 117% | 121% | 87% | 90% |
| 2003 | n/a | 63% | n/a | 94% |

As discussed more fully below, Shell's overstatement of proved reserves, and its delay in correcting the overstatement, resulted from (i) its desire to create and maintain the appearance of a strong RRR, a key performance indicator in the oil and gas industry, (ii) the failure of its internal reserves estimation and reporting guidelines to conform to Rule 4-10's requirements, and (iii) the lack of effective internal controls over the reserves estimation and reporting processes. These failures led Shell to record and maintain proved reserves it knew (or was reckless in not knowing) did not satisfy Rule 4-10's requirements, and to report for certain years a stronger RRR than it actually had achieved. Indeed, Shell was warned on several occasions

---

[3] 17 C.F.R. §210.4-10.

[4] Although Shell estimated the effects of the reserve recategorization on its proved reserves through 1997, its restatement of its FAS 69 standardized measure of future cash flows extended only through 1999.

3

prior to the Fall of 2003 that reported proved reserves potentially were overstated and, in such critical operating areas as Nigeria and Oman, depended upon unrealistic production forecasts. In each case, Shell either rejected the warnings as immaterial or unduly pessimistic, or attempted to "manage" the potential exposure by, for example, delaying de-booking of improperly recorded proved reserves until new, offsetting proved reserves bookings materialized.

On March 3, 2004, the Royal Dutch and Shell Transport boards of directors requested and received the resignations of the chairman of the CMD and the CEO of Shell's Exploration and Production business ("EP") from their respective positions as the chairman of the board of directors of Shell Transport and a member of the board of management of Royal Dutch as well as their positions as managing directors of the Group. On April 19, 2004, Shell also announced that its Group Chief Financial Officer would step aside from that position.

Since announcing the reserves recategorization, Shell has undertaken significant remedial action, including an investigation by the Group Audit Committee ("GAC") and the implementation of measures to address the internal control deficiencies that permitted the overstatement of proved reserves.

1. **Shell's Internal Guidelines Failed to Conform to Rule 4-10's Criteria for "Proved Reserves"**

    a. **Rule 4-10 and SEC Staff Guidance Thereon**

Royal Dutch and Shell Transport are required to include supplemental information on their "proved" oil and natural gas reserves in their annual reports to the Commission on Form 20-F. Rule 4-10 defines "proved reserves" for reporting purposes as "the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made." Under Item 102(5) of Regulation S-K, issuers may not disclose in Commission filings estimates of oil and gas reserves other than "proved reserves" unless such disclosure is required under state law or the law of a non-U.S. jurisdiction.

In 2000 and 2001, the Commission's staff issued interpretive guidance on the disclosure of proved reserves according to the definitions in Rule 4-10.[5] In this guidance, the staff:

- emphasized the conservatism underlying the definition of "proved reserves," highlighting that "[t]he concept of reasonable certainty implies that, as more technical data becomes available, a positive, or upward, revision is much more likely than a negative, or downward, revision";

---

[5] *See* Division of Corporation Finance: Current Accounting and Disclosure Issues (June 30, 2000); Division of Corporation Finance: Frequently Requested Accounting and Financial Reporting Interpretations and Guidance (March 31, 2001).

4

- observed that "[e]conomic uncertainties such as the lack of a market (e.g. stranded hydrocarbons) ... can also prevent reserves from being classified as proved";

- specifically advised that, in "developing frontier areas ... [i]ssuers must demonstrate that there is reasonable certainty that a market exists for the hydrocarbons and that an economic method of extracting, treating and transporting them to market exists or is feasible and is likely to exist in the near future. A commitment by the company to develop the necessary production, treatment and transportation infrastructure is essential to the attribution of proved undeveloped reserves. Significant lack of progress on the development of such reserves may be evidence of a lack of commitment. Affirmation of this commitment may take the form of signed sales contracts for the products; request for proposals to build facilities; signed acceptance of bid proposals; memos of understanding between the appropriate organizations and governments; firm plans and timetables established; approved authorization for expenditures to build facilities; approved environmental permits, etc. Reasonable certainty of procurement of project financing by the company is a requirement for the attribution of proved reserves. An inordinately long delay in the schedule of development may introduce doubt sufficient to preclude the attribution of proved reserves"; and

- with respect to hydrocarbon volumes whose production depends on the extension of government permits or licenses, indicated that automatic renewal of such permits or licenses "cannot be expected ... unless there is a long and clear track record which supports the conclusion that such approvals and renewals are a matter of course."

### b.   The Shell Guidelines

Shell has, since at least the 1970's, relied on – and instructed and trained its personnel to follow – a series of comprehensive, detailed internal guidelines for the estimation and reporting of oil and gas resources. Since the Commission adopted Rule 4-10, Shell also has relied on the guidelines to estimate and report "proved reserves" in its Commission filings. As outlined below, Shell's guidelines failed to conform to the requirements of Rule 4-10, as supplemented by the Commission staff's interpretative guidance, in a number of significant ways.

#### (i)   1998: Shell adopts new guidelines that substantially increase its reported proved reserves

In 1997, following several years of reporting RRR that lagged its peers, Shell EP commissioned a "Value Creation Team" ("VCT") to, among other things, assess the company's conservatism in reporting proved reserves relative to its competitors. In 1998, the VCT reported to EP management that Shell was more conservative than its peers in reporting proved developed

oil and gas reserves,[6] but that it was "early in registering [proved undeveloped] reserves" relative to competitors.[7]

As part of its work, the VCT also evaluated the impact of Shell adopting a "deterministic" approach to estimating reserves in all fields, noting that this would "provide directly comparable [reserves] figures to American competitors," all of whom used such methods to estimate publicly reported proved reserves.[8] This would have represented a sea-change in Shell's reserve reporting practices, which historically were founded on "probabilistic" methodology.[9] Shell ultimately declined to adopt deterministic methods for all fields, in part because this was unlikely to substantially increase reported RRR. As VCT documentation evaluating these approaches describes:

> The only way to provide directly comparable figures to American competitors would be to adopt a deterministic approach to the derivation of proved reserves, whilst retaining the probabilistic approach for internal assessments for project optimization and evaluation. The result is likely to be an increase in reported proved developed reserves, offset partly, or in whole, by a reduction in proved undeveloped reserves. Thus published total proved reserves may not benefit significantly.

Shell instead revised its internal guidelines in 1998 to adopt a system under which it maintained its existing probabilistic methods for estimating proved reserves in "immature" fields, but applied more deterministic methods in "mature" fields, directing OUs to increase proved reserves in such fields to equal "expectation" volumes.[10] This guideline revision added substantial volumes to Shell's reported proved reserves. For instance, nearly 40% of the total proved reserves Shell added in 1998 resulted from this guideline revision. From 1998 through 2001, this guideline revision resulted in more than 1.2 billion boe being added to reported proved

---

[6] "Proved developed oil and gas reserves" are reserves that can be expected to be recovered through existing wells with existing equipment and operating methods. *See* Rule 4-10(a)(3) [17 C.F.R. §210.4-10(a)(3)].

[7] "Proved undeveloped reserves" are reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. *See* Rule 4-10(a)(4) [17 C.F.R. §210.4-10(4)].

[8] An oil and gas reserves estimation methodology is considered "deterministic" if a single best estimate of reserves is made based on known geological, engineering and economic data.

[9] An oil and gas reserves estimation methodology is considered "probabilistic" when the known geological, engineering and economic data are used to generate a range of estimates and their associated probabilities.

[10] As used by Shell, "expectation reserves" are the most likely estimate of hydrocarbon volumes remaining to be recovered from a project that is technically and commercially mature, or from a producing asset. If probabilistic techniques are used in reserve estimation, the expectation reserves are the probability weighted average of all possible outcomes (commonly referred to as the "P50" outcome). If deterministic techniques are used, expectation reserves correspond to the most likely estimate of future recovery.

Generally, a field was "mature" under the revised guidelines if total production was greater than 30% of expectation reserves.

reserves. In implementing this change, however, certain of Shell's operating units failed to perform the detailed analysis necessary to support the resulting increase in proved reserves, particularly in Nigeria. Notably, Shell's only public disclosure of this change was a single sentence accompanying the supplemental oil and gas information in its 1998 annual report, which states only that "[e]stimation methods have been refined during 1998."

### (ii) Shell's internal guidelines did not require market existence or project commitment

Before September 2003, with respect to frontier developments, Shell's guidelines required neither a currently existing market for a field's hydrocarbons nor a commitment by Shell to develop the field or the infrastructure necessary to bring the hydrocarbons to market. As discussed below, the most significant proved reserves addition recorded and maintained as a result was the giant Gorgon natural gas field in Australia, originally booked in 1997.

Though realizing by year-end 2001 that these aspects of its guidelines fell short of SEC requirements, Shell did not remedy these shortcomings until its September 2003 guideline revisions. The 2003 guidelines for the first time required certainty of an existing market (e.g., a sales agreement for proved natural gas reserves) and a "Final Investment Decision" on significant projects before reserves associated with the project could be deemed proved.

### (iii) Shell's guidelines were too permissive regarding government and regulatory approvals

Despite explicit staff guidance in 2000 and 2001 that reserves subject to significant government and regulatory approvals (e.g., production license extensions) required "a long and clear track record which supports the conclusion that such approvals and renewal are a matter of course," Shell's guidelines through 2002 failed to require sufficient assurance of such approvals and, as a result, Shell booked proved reserves for certain projects for which governmental or regulatory approvals were not sufficiently assured for there to be "reasonable certainty" of the recovery of those reserves in future years. These deficiencies impacted reserves bookings in Kazakhstan (Kashagan field), Ireland (Corrib field), Italy (Tempa Rossa field) and the Netherlands (Waddenzee fields).

### (iv) Application of technical requirements

Shell's guidelines failed in several respects to comply with the technical engineering standards embodied in Rule 4-10 for the estimation of oil and natural gas reserve volumes. These technical requirements include both restrictions on estimates of the depth and lateral extent of reserves – known in the engineering field as "lowest known hydrocarbon" and "lateral extent of proved area" requirements – as well as standards governing the use of year-end prices, improved oil and gas recovery techniques and advanced computer reserve modeling, specifically requirements that such methods be supported by sufficient reservoir analogies and/or actual performance information.

### (v) Requirements and procedures for de-booking non-compliant reserves

To be reported as "proved," reserves must satisfy Rule 4-10. If at any point previously reported proved reserves fail to do so, they can no longer be included in proved reserves disclosures. Shell's guidelines did not require the de-booking of reserves that no longer qualified as "proved" under Rule 4-10. Instead, the guidelines urged Shell personnel to "exert caution" in de-booking reserves to "minimize fluctuations [in proved reserves] over time." This effectively shielded questionable proved reserves from de-booking in all but the most extreme circumstances, which contributed to Shell's failure to de-book significant volumes that, by year-end 2001, had been identified as potentially not compliant with Rule 4-10.

## 2. Shell Failed to Maintain Adequate Internal Controls Over Its Reserves Estimation and Reporting Processes

Shell also failed in several respects to implement and maintain internal controls sufficient to provide reasonable assurance that it was estimating and reporting proved reserves accurately and in compliance with applicable requirements. These failures arose from (i) inadequate training and supervision of the operating unit personnel responsible for estimating and reporting proved reserves in the first instance, and (ii) deficiencies in the internal reserves audit function.

### a. Inadequate operating unit controls

Shell's reserve estimation and reporting practices were largely decentralized in that they required operating unit personnel initially to determine resource volume categorization, including estimating volumes of proved reserves for Shell's Commission filings and other public reporting. Shell, however, failed to ensure that its personnel were adequately trained with respect to the Commission's reporting requirements. Indeed, Shell's Group Reserves Auditor observed in January 2003 that operating unit comprehension of both Group guidelines and Commission rules regarding proved reserves was generally lacking.

### b. Deficiencies in the Group Reserve Auditing Function

Shell's decentralized system required an effective internal reserves audit function. To perform this function, Shell historically had engaged as Group Reserves Auditor a lone retired Shell petroleum engineer – who worked only part-time and was provided limited resources and no staff – to audit its vast worldwide operations. Although the Group Reserves Auditor was an experienced reservoir engineer, he received scant, if any, additional training on such critical matters as how he should conduct his work and the rules and standards on which his opinions should be based. He also lacked authority to require operating unit compliance with either Commission rules or Group reserves guidelines. Moreover, he reported to EP management, meaning he was answerable to the same people he audited.

To fulfill his duties, the Group Reserves Auditor made brief visits to a handful of operating units per year. He then issued reports rating the operating unit's systems, compliance with Group guidelines and audit response as "good," "satisfactory" or "unsatisfactory" and

opining whether the operating unit's reported reserves met Group guidelines.[11] Although more frequent operating unit visits could occur in principle, they occurred in practice only once every four or more years.

The Group Reserves Auditor also issued an annual report on the reasonableness of Shell's year-end total reserves summary. Until his February 2004 report on Shell's 2003 proved reserves, the Group Reserve Auditor focused as much on whether Group proved reserves complied with Group guidelines as he did on whether they complied with Commission requirements.

Critically, the Group Reserves Auditor also failed to act independently in several respects. At times, he allowed proved reserves associated with a project to remain booked because he was more "bullish" on its prospects than the local management responsible for the project. At other times, he advised local management to submit development plans that were unlikely ever to be executed solely to support booking proved reserves for otherwise uneconomic projects. This lack of independence facilitated the booking of questionable reserves (such as approximately 75 million boe booked in 2001 connection with the Block 18 project in Angola) and contributed to Shell's maintenance of increasingly questionable bookings (such as Gorgon and certain legacy bookings in Brunei) well after they should have been de-booked.

### 3. Shell Booked and Maintained Significant Reserves in Australia, Nigeria and Oman that Failed to Qualify as "Proved Reserves" Under Rule 4-10

Shell's reserves recategorization involves a number of countries and, often, multiple projects or fields within each country. Events surrounding improper proved reserves bookings or maintenance in three of the largest affected countries – Australia's Gorgon project, the Shell's onshore operations in Nigeria and Shell's Omani interests (which, collectively, account for between approximately 50% and 90% of the recategorization in the years 1997 through 2002) – exemplify the faults in Shell's reserves estimation and reporting practices.

#### a. Gorgon (Australia)

Gorgon, an undeveloped frontier gas field off the northwest coast of Australia, was discovered in 1980. No gas from Gorgon has ever been sold or firmly contracted for, and Shell has yet to make a Final Investment Decision to develop Gorgon's hydrocarbons. Nonetheless, in 1997, Shell booked over 550 million boe of proved reserves in Gorgon based on indications of interest from a prospective purchaser and on the then-current Shell guidelines. At that time, Shell did not have a contract to sell Gorgon gas, had no firm development plan and had not made a Final Investment Decision. By 1999, the Asian economic crisis had, at least, significantly delayed whatever market interest there had been in Gorgon gas, and Shell still had not firmly committed to develop the field. Yet, Shell maintained Gorgon as proved reserves.[12]

---

[11] From the start of his tenure in January 1999 until September 2003, the Group Reserves Auditor did not issue a single "unsatisfactory" rating.

[12] In 1999, further technical work by Gorgon's operator indicated additional hydrocarbon volumes in the field. Because there was no currently existing market for Gorgon gas, however, Shell decided not to add these volumes as

9

On several occasions from 1999 through 2003, Shell reevaluated whether to maintain Gorgon's "proved" status. During this time, Shell learned that none of its partners in Gorgon had booked proved reserves in the field. In March 2000, Shell's Australian affiliate was instructed by regional Shell management to review options for gradually de-booking Gorgon proved reserves, such as by offsetting Gorgon de-bookings against then-anticipated new proved reserves bookings in Shell's Sunrise natural gas field in the Timor Sea. Though these offset opportunities did not materialize, Shell nevertheless determined to maintain Gorgon as proved reserves unless, as Shell's then-Group Reserves Coordinator concluded in September 2002, it became "absolutely clear that development will not proceed in a reasonable time frame."

By December 2002, Shell's EP personnel recognized that Gorgon was a "dodgy" booking whose status as proved reserves was not supportable even under Shell's lenient 2002 internal reserves guidelines. Yet, Shell did not de-book Gorgon from proved reserves until the 2004 reclassification.

### b.  Shell Petroleum Development Company ("SPDC") (Nigeria)

Nigeria represents one of Shell's largest worldwide concentrations of reserves and production. Shell's Nigerian operations generally are divided into on-shore and shallow-water operations (run by SPDC) and deep-water operations.

By the end of 1999, SPDC's existing proved reserves – which had increased significantly because of the 1998 revised Shell reserves guidelines – had grown increasingly dependent on production forecasts that gave the appearance that the proved portion of the reserves could be produced within the remaining license period. These projections, in turn, depended on a number of assumptions concerning improved economic and operating conditions, such as improvements in the country's economic stability, increases in Shell's production quota from the Nigerian authorities and increases in Nigeria's production quota from OPEC. Apart from the divergence of these "assumptions" from the requirement in Rule 4-10 that proved reserves be based on "existing conditions," none of these assumptions was reasonable, particularly in light of the fact that SPDC's operations performed well below the projected levels throughout the period.

Many of these concerns were highlighted for Shell EP management in January 2000 in a presentation discussing, among other things, that a substantial part of SPDC's reported proved reserves (perhaps more than 600 million boe) was constrained by license expiration and depended on unrealistic production forecasts that appeared to have been "reverse engineered" solely to support the reserve figures.[13] EP management agreed only to impose a freeze on the booking of additional reserves in SPDC and did not order any of the potentially exposed reserves to be de-booked. The very next month, however, the Group Reserves Auditor's report on Shell's

---

proved. Inconsistently, the lack of an existing market did not prompt Shell to de-book the Gorgon reserves already recorded.

[13] This presentation also concluded that Shell's 1999 RRR was 37%. EP management forcefully rejected this conclusion and instead caused Shell to report a 56% RRR for that year.

10

1999 proved reserves repeated these concerns, noting that SPDC faced license expiration problems and could support its proved reserves figures only through "significant aspirational upturns in future offtake levels in order to justify their proved reserves levels." The Group Reserves Auditor repeated these concerns, without EP taking any steps to de-book non-compliant reserves, in each of his next two annual reports.

By early 2002, other Shell reserves personnel, including the Group Reserves Coordinator, had raised concerns within EP that SPDC's reported proved reserves could not be produced within existing license constraints. In a February 11, 2002 note to the CMD, the EP reported that in certain operations in Nigeria, Oman and Abu Dhabi, "no further proved reserves can be booked since it is no longer 'reasonably certain' that the proved reserves will be produced within license" and that "[t]he overall exposure should the [operating unit] business plans not transpire is 1,300 mln boe." The note concludes that "[w]ork has begun to address this important issue," but it failed to recommend any de-bookings to address the license expiration issues.[14]

EP thereafter continued to review the technical and commercial maturity of SPDC's reserves. After completing the initial phase of its work in September 2003, the EP review team concluded that there was an approximately 750 million boe "gap" between the reported proved reserves and those supported by projects in the business plans. That same month, the Group Reserves Auditor reported the results of his just-completed audit of SPDC's proved reserves, rating SPDC's proved reserves reporting as "unsatisfactory" and concluding that "there can be no doubt that the portfolio of proved oil reserves per 1.1.2003 has been overstated due to insufficient maturity in the underlying future projects." The Group Reserves Auditor noted that the "precise" amount of the de-booking required was dependent on the additional reviews already underway by EP.

By November 2003, the second phase of the EP review team's work was complete. It confirmed the earlier findings of a 750 million boe "gap" and added another 800 million boe of proved reserves that were not sufficiently mature under Shell guidelines. This information, combined with the unsatisfactory SPDC audit report and contemporaneous negative information and audit reports on Shell's Omani operations, ultimately led Shell to comprehensively review all of its proved reserves exposures and, eventually, to the January 9, 2004 recategorization announcement.

### c. Oman

Shell's interests in Oman derive from its indirect 34% ownership of Petroleum Development of Oman ("PDO"), an Omani company 60% of which is owned by the Omani government. Shell is the largest private shareholder in PDO and serves as PDO's technical adviser.

At year-end 2000, Shell and PDO determined to raise PDO's proved reserves estimates by assuming that, for fields of certain maturity, both proved developed and proved undeveloped

---

[14] Ultimately, in late 2002 and early 2003, Shell sought and received legal advice both from Nigerian and U.S. counsel that Shell's Nigerian operation had the equivalent of a legal right to a license extension.

reserves would be increased to equal the expectation developed and undeveloped volumes. This upward revision was based on the 1998 revisions to Shell's guidelines and added 251 million boe to Shell's reported proved reserves at December 31, 2000.

In mid-2001, PDO began experiencing a steep production decline. Within a few months, the situation had grown sufficiently dire that PDO took the highly unusual step of withdrawing its long-term business plan for 2002. The production decline also prompted the Omani government to question the volume of expectation reserves PDO was carrying, as a result of which Shell agreed to a $30 million "down payment" to the Omani government on what was expected to be an eventual refund of expectation reserve booking fees it previously had received. By the end of 2001, as its production continued to drop, PDO had no reliable or realistic long-term plan on which to base its proved reserves reporting. With Shell's encouragement, PDO instead adopted an "aspirational" production forecast to support its reported proved reserves figures.

During 2002, Shell was advised that PDO's proved reserves figures depended upon sustaining current production rates, without any declines, throughout the remaining lifetime of the production license, which was to expire in 2012. In view of the production declines already being experienced, this was not realistic. Shell nevertheless continued to report its share of PDO's reserves as proved at year-end 2002.

Further reviews of PDO reserves in 2003 and 2004 ultimately concluded that 393 million boe of the Shell share proved reserves associated with PDO had to be de-booked as non-compliant with Rule 4-10. Of this amount, 144 million boe were found non-compliant because they were "associated with projects ... not sufficiently mature to qualify as proved undeveloped reserves." The remaining 249 mboe were non-compliant because they were not supported by any identified projects.

### 4. Shell Failed to Timely and Effectively Ensure that its Reported "Proved Reserves" Complied with Rule 4-10

Until January 2004, Shell failed to timely and appropriately act to ensure that its reported proved reserves complied with Rule 4-10 and instead sought to ascertain the extent to which the differences could be either reconciled without impacting Shell's existing proved reserves or rationalized as immaterial. Further, the non-executive directors of Royal Dutch and Shell Transport, including the members of the GAC, were not provided with the information necessary for the boards of the two companies to ensure that timely and appropriate action was taken with respect to the proved reserves estimation and reporting practices.

In January 2002, the Group Reserves Auditor's report on Shell's 2001 proved reserves stated that "recent clarifications of FASB reserves guidelines by the US Security [sic] and Exchange Commission (SEC) have shown that current Group reserves practice regarding the first-time booking of Proved reserves in new fields is in some cases too lenient." The Group Reserves Auditor recommended that the "Group guidelines should be reviewed [and] [f]irst-time bookings should be aligned closer with SEC guidance and industry practice and they should be allowed only for firm projects with technical maturity and full economic viability."

On February 11, 2002, an EP Note for Information to the CMD addressed the divergence between Shell's guidelines and the Commission's rules and estimated the possible impact of this divergence on Shell's reported proved reserves. The Note explicitly relayed that "[r]ecently the SEC issued clarifications that make it apparent that the Group guidelines for booking Proved Reserves are no longer fully aligned with the SEC rules." Potential exposures identified to the CMD at this time included approximately 1 billion boe of proved reserves relating to projects, including Gorgon, where potential environmental, political or commercial factors might prevent development, and 1.3 billion boe relating to reserves associated with projects, including certain projects in Nigeria and Oman, that might not be producible within existing license constraints. The note failed to recommend de-bookings to CMD and Shell did not take action to de-book any of these proved reserves at that time.

On February 25, 2002, the EP CEO provided a note to the CMD regarding EP's 2001 performance. In his cover note to the presentation, the EP CEO asked his colleagues to "keep a balanced perspective on EP performance in 2001 and not have it overshadowed by the high profile issues around production growth and reserves replacement." As one of the "Main Issues," the note stated:

> In 2001, SEC issued clarifications of the rules for reserves reporting that made it clear that the probabilistic approach still advocated in the Shell guidelines is, in many cases too aggressive. This will likely impact future bookings in new fields (e.g., Nigeria SNEPCo and Brazil) and possibly existing booked volumes (e.g., Gorgon, Angola Block 18, Ormen Lange and Waddenzee representing some 1.0 bln boe).
>
> SPDC, PDO and Abu Dhabi represent 18% of EP's production, where reserves can no longer be booked due to license expiry issues and production limitations. The reserves exposures in these OUs is over 1 bln bbls.

The note failed to recommend de-bookings to CMD and Shell did not take action to de-book any of these proved reserves at that time.

In July 2002, EP again reported to CMD that the SEC was tightening its requirements respecting proved reserves. EP, however, reported that "[i]t is considered unlikely that potential over-bookings would need to be de-booked in the short term, but the reserves that are exposed to project risk or license expiry cannot remain on the books indefinitely if little progress is made to convert them to production in a timely manner." The minutes of this meeting, however, also reflect that the executives were advised of the concerns that had arisen within EP "that some booking practices had been too aggressive in the past." A Note for Discussion prepared for this meeting repeats the observation that "[w]ith the benefit of hindsight, some of the organic revisions made in recent years now appear somewhat aggressive," principally in Gorgon and SPDC. The Note observes that without Gorgon and SPDC bookings, "total Proved RRR over the last 10 years would be reduced from 102% to 88%."

By September 2002, the CEO of EP internally spoke in blunt terms of his perception of the operational and performance problems facing EP, noting to his CMD colleagues that "[w]e

13

are struggling on all key criteria" and that "RRR remains below 100% mainly due to aggressive booking in 1997-2000." He further observed that "we have tried to adhere to a bunch of criteria that can only be managed successfully for so long" and admonished that "[g]iven the external visibility of our issues (lean organic development portfolio funnel, RRR low, F&D unit costs rising), the market can only be 'fooled' if 1) credibility of the company is high, 2) medium and long-term portfolio refreshment is real and/or 3) positive trends can be shown on key indicators."

A month later, the Group Chairman emailed the EP CEO that he was "not contemplating a change in the external promise . . . ." The next day, the EP CEO responded, stating "I must admit that I become sick and tired about arguing about the hard facts and also can not perform miracles given where we are today. If I was interpreting the disclosure requirements literally (Sorbanes-Oxley Act etc.) [sic] we would have a real problem."

None of these events prompted Shell to de-book significant volumes. To the contrary, Shell continued to make large, questionable proved reserves bookings during this period, such as the September 2002 booking of 380 million boe in the Kashagan field in Kazakhstan, on which project Shell did not expect to make a Final Investment Decision until 2003 at the earliest. This booking alone increased Shell's 2002 RRR by approximately 26%.

By the Summer of 2003, Shell's analysis of reserves exposures had progressed, but still no de-bookings were recommended to the CMD. A July 22, 2003 CMD Note for Information reported that "some 1040 million boe (5%) is considered to be potentially at risk." The note concluded, however, "at this stage, no action in relation to entries in the [Proved Reserves Exposure] Catalogue is recommended . . . . It should be noted that the total potential exposure listed in Appendix C is broadly offset by the potential to include gas fuel and flare volumes in external reserves disclosures." The Proved Reserves Exposure Catalogue in Appendix C quantifies "exposures" at approximately 1 billion boe and "threats" at approximately 1.6 billion boe, or a total of approximately 2.6 billion boe known to be or potentially noncompliant with Rule 4-10.

In late August 2003, EP completed a Note for Information to the GAC on Shell's reserves practices. The final version, dated August 26, 2003, was included in materials circulated to the GAC for its October 21, 2003 meeting. The Note apprises the Committee of steps taken to address possible non-compliance with the Commission's regulations. The GAC, however, was advised that "[m]uch, if not all, of the potential exposure arising from interpretation of factors listed above ["Possible areas of non-compliance with SEC regulations"] is offset by Shell's practice of not disclosing reserves in relation to gas production that is consumed on site as fuel or (incidental) flaring and venting."

Notwithstanding the disclosure of "potential exposures," in the October 21 meeting with the GAC, EP personnel failed to update the Committee with several critical facts that had emerged since the Note was prepared, including the unsatisfactory audit report on Nigeria, the initial conclusions of the SPDC review that there was a significant "gap" between proved

14

reserves carried and those that could be supported, and a substantially reduced estimate of the potential offset from "fuel and flare" gas.[15]

### 5. Shell's Remedial Actions

Shell has undertaken substantial remedial efforts in connection with the reserves recategorization as well as corporate governance issues raised following the recategorization announcement, including the following:

- a determination to self-report the need for a recategorization to both the public and the Commission prior to the involvement of any external governmental agency or public release of the reserves overstatement;

- an independent investigation into the facts and circumstances ordered by the GAC, the results of which have been provided to the Commission;

- retention of an independent reserves engineering firm to assist in a review of Shell's proved reserves, which led to the March 18 and April 19 announcements of additional recategorizations;

- formal review and approval of all reported reserves by the CMD and review by the GAC on an annual basis;

- enhancements to the resources of the Group Reserves Auditor, including the provision for systematic and consistent use of external reserves experts in the audit process;

- a restructuring of the Group Reserves Audit function to report through the Group Internal Audit function, with direct access to the GAC;

- expansion of the Group Reserves Audit program to include more frequent and detailed audits, including annual audits of every major operating unit;

- implementation of a Global Reserves Committee within EP, including an approval process for all reserves through regional peer challenges on reserves decisions;

- a restructuring of the EP business to place reserves reporting within the technical reserves function rather than the planning function;

- strengthening of the line responsibilities for reserve reporting within EP to ensure that appropriate levels of authority and responsibility for reserves booking and de-booking

---

[15] Although the August 26, 2003 Note for Discussion's report on possible "fuel and flare" offsets may have been consistent with EP's understanding at the time it was finalized, by October 20, 2003, a Note to the CEO of EP reported that, for reasons EP did not yet understand, the potential offset from "fuel and flare" gas would be only approximately 300 million boe rather than the 1 billion boe previously believed.

15

- decisions are assigned to local Chief Reservoir Engineers, local management and EP management;

- inclusion of reserves reporting in the existing Group assurance and disclosure controls review processes;

- focused and enhanced training of EP reserves staff worldwide to ensure that the Commission's rules, guidance and compliance requirements are communicated to and understood by all involved in the reserves estimation and reporting process; and

- significant revision to the Shell guidelines to ensure that they provide clear direction compliant with the requirements of Rule 4-10 on the reporting of proved reserves.

- a restructuring of the Group finance function to make business unit chief financial officers report directly to the Group CFO;

- enhancement of the Group legal function to improve the ability of Group management to benefit from appropriate legal advice concerning potential corporate governance, reporting and disclosure issues.

- appointment of a non-executive chairman of Shell Transport and a non-executive chair of the conference of the boards of Royal Dutch and Shell;

- creation of a committee of members of the Royal Dutch and Shell Transport boards to study issues relating to the structure and governance of the Group, including consultation with shareholders and a public report of the results of the study; and

- a public commitment by the board of Royal Dutch to submit a proposal to shareholders at Royal Dutch's 2005 Annual General Meeting to abolish the "priority shares" in Royal Dutch.

## IV.
## LEGAL ANALYSIS

### A. Violations of Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit the employment of a fraudulent scheme or the making of material misrepresentations and omissions in connection with the purchase or sale of securities. To violate these provisions, the alleged misrepresentations or omitted facts must be material. Information is material if it would have assumed significance in the investment deliberations of a reasonable investor. *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).

Violations of these provisions require proof of *scienter*. *Aaron v. SEC*, 446 U.S. 680 (1980). *Scienter* is the "mental state embracing intent to deceive, manipulate or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976), which may be established by showing that the defendants acted intentionally or with severe recklessness. *See Broad v. Rockwell International*

16

*Corp.*, 642 F.2d 929 (5th Cir.) (*en banc*), *cert. denied*, 454 U.S. 965 (1981). To establish *scienter* on the part of a company, the mental state of the company's officers is imputed to the company. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

Based on the conduct described above, Respondents Royal Dutch and Shell Transport violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Respondents knowingly or recklessly reported proved reserves that were non-compliant with Rule 4-10, and failed (i) to ensure that Shell's internal proved reserves estimation and reporting guidelines complied with Rule 4-10 and (ii) to take timely and appropriate action to ensure that their reported proved reserves were not overstated in their filings with the Commission and other public statements.

**B.     Violations of Section 13(a) and Rules 13a-1 and 12b-20**

Section 13(a) of the Exchange Act and Rule 13a-1 thereunder require issuers whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act to file annual reports with the Commission. These reports must be complete and accurate in all material respects. *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991); *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 913 (1979). Rule 12b-20 of the Exchange Act requires that an issuer's periodic reports include any additional information "necessary to make the required statements, in the light of the circumstances under which they are made, not misleading."

Based on the conduct described above, Respondents Royal Dutch and Shell Transport violated Section 13(a) of the Exchange Act and Rules 13a-1 and 12b-20 thereunder. Respondents' failures to ensure that Shell estimated and reported proved reserves accurately in compliance with Rule 4-10 caused them to file annual reports on Form 20-F for the years 1997 through 2002 that were materially inaccurate in that they overstated Respondents' reported proved reserves and accompanying supplemental information, including the standardized measure of future cash flows.

**C.     Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) and Rule 13b2-1**

Section 13(b)(2)(A) of the Exchange Act requires issuers to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." Rule 13b2-1 promulgated under the Exchange Act provides that no person shall directly or indirectly falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A). Section 13(b)(2)(B) of the Exchange Act requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of accurate financial statements. No showing of *scienter* is necessary to establish a violation of these provisions. *See SEC v. World-Wide Coin Investments, Ltd., et al.*, 567 F. Supp. 724, 749-51 (N.D. Ga. 1983).

Based on the conduct described above, Respondents Royal Dutch and Shell Transport violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. Respondents failed to ensure that Shell created and maintained accurate estimates of its proved reserves in compliance

with Rule 4-10, and failed to ensure that Shell implemented and maintained adequate controls with respect to Shell's reserves processes sufficient to provide assurance that the reserves were estimated and reported accurately in accordance with Rule 4-10.

## V.
## FINDINGS

Based on the foregoing, the Commission finds that Respondents Royal Dutch and Shell Transport violated Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1 and 13b2-1 thereunder.

## VI.
## UNDERTAKINGS

A.   Shell has undertaken and agreed to cooperate fully with the Commission in any and all investigations, litigation, or other proceedings relating to or arising from the matters described herein. In connection with such cooperation, Shell has undertaken:

　　　1.   To produce, without service of subpoena, any and all non-privileged documents requested by the Commission staff; and

　　　2.   To use its best efforts consistent with applicable local laws to make available current Shell employees, including non-United States nationals, (1) to be interviewed by the Commission's staff at such times and such locations as the staff may reasonably direct and (2) to appear and testify without service of subpoena or other process in such investigations, depositions, hearings or trials as may be requested by the Commission's staff.

B.   Shell has undertaken to spend $5 million in the development and implementation of a comprehensive internal compliance program under the direction and oversight of the Group's Legal Director. Shell has committed that such amounts will be in addition to any amounts that already have been budgeted to the Group's compliance function. Shell has further undertaken to report to the Commission staff within twelve months on the expenditure of the funds and the status of the compliance program.

　　　In determining to accept the Offer of Royal Dutch and Shell Transport, the Commission has considered these undertakings as well as Shell's remedial measures and cooperation with the Commission staff's investigation.

## VII.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in the Offer.

Accordingly, it is hereby ORDERED: Pursuant to Section 21C of the Exchange Act, Respondents Royal Dutch and Shell Transport shall cease and desist from committing or causing any violation or future violation of Sections 10(b), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1 and 13b2-1 thereunder.

By the Commission.

Jonathan G. Katz
Secretary